576 A.2d 274

IN THE MATTER OF RULES ADOPTION REGARDING INMATE MAIL TO ATTORNEYS, PUBLIC OFFICIALS, AND NEWS MEDIA REPRESENTATIVES (N.J.A.C. 10A:18–1.3; 18–2.7; 18–2.8; 18–3; 18–4.7).

Argued March 27, 1990—Decided July 17, 1990.

138

*Catherine M. Brown,* Deputy Attorney General, argued the cause for appellant, New Jersey Department of Corrections (*Robert J. Del Tufo,* Attorney General of New Jersey, attorney; *Michael R. Clancy,* Assistant Attorney General, of counsel).

*Catherine A. Hanssens,* Assistant Deputy Public Defender, argued the cause for respondent Public Advocate of New

Jersey (*Thomas S. Smith, Jr.*, Acting Public Advocate, attorney).

The opinion of the Court was delivered by

GARIBALDI, J.

This appeal concerns the constitutionality of a narrow category of regulations promulgated by the New Jersey Department of Corrections, *N.J.A.C.* 10A:18–2.7 and 10A:18–2.6, which are part of an overall regulatory scheme affecting the exchange of written matter between inmates and non-inmates. Specifically, the issue is whether the federal constitution requires that the category of privileged "legal correspondence" be expanded to include correspondence with public officials, government agencies, and the media.

## I

On January 5, 1987, the New Jersey Department of Corrections (DOC) proposed regulations governing mail, visitation, and telephone rights of state prisoners. Although the DOC did not hold public hearings, it solicited written comments from the Public Advocate, the Superintendent of a State Correctional Facility, and two state prisoners. On June 5, 1987, after incorporating certain proposals, the DOC adopted the regulations. 19 *N.J.R.* 1214. Thereafter, the Public Advocate filed this appeal directly to the Appellate Division.[1]

The regulations regarding inmate mail, *N.J.A.C.* 10A:18–1 to 10A:18–5, establish guidelines for processing and examining

---

[1] On March 15, 1989, during the pendency of this matter in the Appellate Division, the DOC amended the regulation to expand the list of outgoing mail that would not be opened or examined under *N.J.A.C.* 10A:18–2.7(b) to include: (1) The President of the United States; (2) The Vice–President of the United States; (3) Members of Congress; (4) Members of the Federal Parole Board; and (5) the Director of the Federal Bureau of Prisons. 21 *N.J.R.* 1014–15. The DOC also deleted a provision allowing publications to be sent to certain state officials without restriction. *Ibid.*

mail between inmates and persons or entities outside the correctional facility. The regulations divide mail into four categories: correspondence, legal correspondence, publications and packages. Correspondence is defined as the "exchange of letters" and refers to all mail that is neither a publication nor legal mail. *N.J.A.C.* 10A:18–1.3. Legal correspondence is the exchange of letters between an inmate and:

1. An attorney of this State or any other state when properly identified as such on the outside of the envelope;
2. A State Public Defender;
3. Office of the Public Advocate;
4. Attorney General's office;
5. Federal and State courts;
6. Federal and State court judges;
7. Offices of Legal Services;
8. Legal assistance clinics run by accredited law schools of this or any other State;
9. Administrative Office of the Courts;
10. Prosecutors' offices;
11. Federal Public Defender;
12. Department of Corrections' Internal Affairs Unit;
13. Department of Corrections' Ombudsman; and
14. Office of Administrative Law. [*N.J.A.C.* 10A:18–1.3].

Publications comprise all other reading matter, such as hardcover books, newspapers, and magazines. *N.J.A.C.* 10A:18–4.1 to 10A:18–4.17.

The DOC's classification of mail determines how it is processed. "Incoming correspondence" other than "legal correspondence" is opened and inspected for contraband but is not read "unless there is reason to believe that [it] contains disapproved content," and then only "upon [the] prior authorization of the Superintendent or his or her designee." *N.J.A.C.* 10A:18–2.6(g). Correspondence is deemed "disapproved" if

1. [It] contains material which is detrimental to the security and/or order of the correctional facility because it incites violence based upon race, religion, creed or nationality and a reasonable inference can be drawn, based upon the experience and professional expertise of correctional administrators, that it may result in the outbreak of violence within the facility;
2. [It] contains information regarding the manufacture of:
    i. Explosives;

    ii.  Weapons;

    iii.  Controlled dangerous substances;

    iv.  Escape plans;

    v.  Lockpicking; or

    vi.  Anything of a similar nature.

3. [It] contains information which appears to be written in code;

4. [It] contains information concerning activities within or outside the correctional facility which would be subject to criminal prosecution under the law of New Jersey or the United States;

5. [It] incites violence or destructive or disruptive behavior toward:

    i.  Law enforcement officers;

    ii.  Department of Corrections personnel; or

    iii.  Correctional facility programs or procedures.

6. [It] contains material which, based upon the experience and professional expertise of correctional administrators and judged in the context of a correctional facility and its paramount interest in security, order and rehabilitation:

    i.  Taken as a whole, appeals to a prurient interest in sex;

    ii.  Lacks, as a whole, serious literacy, artistic, political or scientific value; and

    iii.  Depicts, in a patently offensive way, sexual conduct including patently offensive representations or descriptions of ultimate sexual acts, masturbation, excretory functions, lewd exhibition of the genitals, sadism or masochism. [*N.J.A.C.* 10A:18–2.14.]

Incoming "legal correspondence," however, is opened and inspected for contraband only in the presence of the inmate to whom it is addressed, and may not be read or copied. *N.J.A.C.* 10A:18–3.4. Such correspondence is referred to the Deputy Commissioner only if there is a "substantial reason to believe that [ ] [it] is not legal in nature or that it contains disapproved content." *Ibid.*

"Outgoing correspondence" is opened and examined only if there is "reason to believe that [ ] [it] contains disapproved content," and then only with the prior approval of the Superintendent or his or her designee. *N.J.A.C.* 10A:18–2.7(c). Outgoing "legal correspondence" and outgoing correspondence addressed to the President or Vice–President of the United States, Members of Congress, Members of the Federal Parole Board, the Director of the Federal Bureau of Prisons, the Governor, Members of the State Legislature, Members of the State Parole

Board, and the Commissioner, however, is not opened, read, or censored. *N.J.A.C.* 10A:18–2.7(b).

Publications are treated essentially the same as non-privileged incoming and outgoing correspondence. *N.J.A.C.* 10A:18–4.5; 10A:18–4.7. All incoming and outgoing packages are opened and inspected. *N.J.A.C.* 10A:18–5.3; 10A:18–5.4.

The Public Advocate challenges those regulations that allow corrections officials to open, read, and censor mail between inmates and public officials, government agency officials, and media representatives. He proposes that such incoming and outgoing mail between an inmate and those persons should be treated as privileged "legal correspondence." That would require that "outgoing correspondence" to such persons could not be opened or read, and that "incoming correspondence" could be opened only in the presence of the inmate and could not be referred to corrections personnel unless there was substantial "reason to believe" that it was not legal or that it contained disapproved contents.

In addressing the Public Advocate's claim, the Appellate Division first considered what standard of review it should apply to analyze the constitutionality of the regulations. It found that the "least restrictive alternative test" outlined in *Procunier v. Martinez,* 416 *U.S.* 396, 413–14, 94 *S.Ct.* 1800, 1811, 40 *L.Ed.*2d 224, 240 (1974), governs in a case such as this, where the prison regulations affect the constitutional rights of non-prisoners as well as prisoners. It reasoned that *Martinez* survived the United States Supreme Court's subsequent decision in *Turner v. Safley,* 482 *U.S.* 78, 89–91, 107 *S.Ct.* 2254, 2261–63, 96 *L.Ed.*2d 64, 79–80 (1987), in which the Court applied a "reasonable relationship" test to a prison regulation impinging solely on inmates' constitutional rights. Applying the *Martinez* standard, the Appellate Division invalidated the regulations "to the extent that [they] [ ] prevent correspondence with the media, public officials and government agencies from being

treated as 'legal correspondence.'" 232 *N.J.Super.* 478, 490, 557 *A.*2d 698.

Subsequent to the Appellate Division decision, the United States Supreme Court decided *Thornburgh v. Abbott*, 490 *U.S.* ——, 109 *S.Ct.* 1874, 104 *L.Ed.*2d 459 (1989), in which it applied *Turner*'s reasonableness test to uphold prison regulations affecting incoming publications mailed from outside publishers to inmates.

We granted certification, 117 *N.J.* 168, 564 *A.*2d 884 (1989).

## II

In *Procunier v. Martinez, supra,* 416 *U.S.* at 396, 94 *S.Ct.* at 1800, 40 *L.Ed.*2d at 224, the United States Supreme Court first set forth the standard of review governing prison regulations restricting freedom of speech. The California regulations at issue there authorized broad censorship of outgoing materials that "unduly complain," "magnify grievances," or "express[ ] inflammatory political, racial, religious or other views or beliefs." *Id.* at 399–400, 94 *S.Ct.* at 1804–05, 40 *L.Ed.*2d at 232. Recognizing that "the First Amendment liberties of free citizens are implicated in the censorship of prisoner mail," *id.* at 409, 94 *S.Ct.* at 1809, 40 *L.Ed.*2d at 238, the Court reviewed the regulations under the following test:

First, the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression.... [Prison officials] ... must show that a regulation authorizing mail censorship furthers one or more of the substantial government interests of security, order, and rehabilitation. Second, the limitation of First Amendment freedoms must be no greater than necessary or essential to the protection of the particular governmental interest involved. [*Id.* at 413, 94 *S.Ct.* at 1811, 40 *L.Ed.*2d at 240]

Hence, while substantial government interests could validate restrictions on outgoing inmate mail under *Martinez,* "a restriction ... will ... be invalid if its sweep is unnecessarily broad." *Id.* at 413–14, 94 *S.Ct.* at 1811, 40 *L.Ed.*2d at 240. Applying that analysis, the Court struck down the California regulatory scheme.

The Court's subsequent treatment of free speech claims in the prison content, however, signalled a retreat from *Martinez'* heightened standard of scrutiny. *See* Note, "Prison Regulations Constitutionally Valid If Reasonably Related to Legitimate Penological Interests," 19 *Seton Hall L.Rev.* 429 (1989). *See also Bell v. Wolfish*, 441 *U.S.* 520, 99 *S.Ct.* 1861, 60 *L.Ed.*2d 447 (1979) (upholding regulation restricting inmates receipt of certain books); *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 *U.S.* 119, 97 *S.Ct.* 2532, 53 *L.Ed.*2d 629 (1977) (upholding regulations prohibiting inmate-to-inmate solicitation of union membership); *Pell v. Procunier*, 417 *U.S.* 817, 94 *S.Ct.* 2800, 41 *L.Ed.*2d 495 (1974) (upholding regulations denying media interviews).

More recently in *Turner v. Safley, supra*, 482 *U.S.* at 78, 107 *S.Ct.* at 2254, 96 *L.Ed.*2d at 64, the Court considered the constitutionality of two Missouri prison regulations, the first of which restricted inmate-to-inmate correspondence and the second of which prohibited inmate marriages to other inmates and to non-prisoners. Describing its task as "formulat[ing] a standard of review for prisoners' constitutional claims," *id.* at 85, 107 *S.Ct.* at 2259, 96 *L.Ed.*2d at 76, the Court declared that "[i]f *Pell, Jones,* and *Bell* have not already resolved the question posed in *Martinez,* we resolve it now: when a prison regulation impinges on *inmates'* constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 89, 107 *S.Ct.* at 2261, 96 *L.Ed.*2d at 79 (emphasis added). That "reasonableness" analysis consisted of a four-prong inquiry:

First, there must be a "valid rational connection" between the prison regulation and the legitimate governmental interest put forward to justify it.... A second factor ... is whether there are alternate means of exercising the right that remain open to prison inmates.... A third consideration is the impact [that] accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally.... Finally, the absence of ready alternatives is evidence of the reasonableness of the regulation. [*Id.* at 89–91, 107 *S.Ct.* at 2261–63, 96 *L.Ed.*2d at 79–80 (citations omitted).]

Applying those criteria, the Court upheld the correspondence regulations as "reasonably related to valid corrections goals." *Id.* at 93, 107 *S.Ct.* at 2264, 96 *L.Ed.*2d at 82. With respect to the restriction on inmate marriages, which implicates the rights of non-prisoners, the Court declined to address whether it should be analyzed under *Martinez*, reasoning that "even under the reasonable relationship test, [it] [ ] does not withstand scrutiny." *Id.* at 97, 107 *S.Ct.* at 2266, 96 *L.Ed.*2d at 84.

The Court's most recent pronouncement on the constitutionality of inmate mail regulations was *Thornburgh v. Abbott, supra,* 490 *U.S.* at ——, 109 *S.Ct.* at 1874, 104 *L.Ed.*2d at 459. At issue in *Thornburgh* were federal prison regulations that permitted the warden to reject *incoming* publications to inmates if he or she determined that they were detrimental to the security, good order, or discipline of the prison or if it might facilitate criminal activity. *Id.* at ——, 109 *S.Ct.* at 1876–77, 104 *L.Ed.*2d at 467. At the outset, the Court focused on the proper standard of review it should apply to regulations limiting the access of publications to inmates.

The Court first rejected *Martinez* as requiring a "less-restrictive alternative" test, noting that it "required no more than a challenged regulation be 'generally necessary' to a legitimate government interest." *Id.* at ——, 109 *S.Ct.* at 1880, 104 *L.Ed.*2d at 471. The majority continued, noting the critical distinction in *Martinez:*

> [A] careful reading of *Martinez* suggests that our rejection of the regulation at issue resulted not from a least restrictive means requirement, but from our recognition that the regulated activity centrally at issue in that case—*outgoing* personal correspondence from prisoners—did not, by its very nature, pose a serious threat to prison order and security.
>
> [*Id.* at —— ——, 109 *S.Ct.* at 1880, 104 *L.Ed.*2d at 471–72 (emphasis added) (footnote omitted).]

The Court stated that "[c]ategorical different consideration—considerations far-more typical of the problems of prison administration" *Id.* at ——, 109 *S.Ct.* at 1881, 104 *L.Ed.*2d at 472, surround incoming publications. The majority reasoned that once in the prison, materials disclosing an inmate's personal

beliefs, sexual affiliation, or gang affiliation can circulate, with the "potential for coordinated disruptive conduct." *Id.* at ——, 109 *S.Ct.* at 1881, 104 *L.Ed.*2d at 472. The fear is that the inmate will distribute the material in the volatile prison environment. In view of those concerns, the Court held that the "regulations affecting the sending of a 'publication' to a prisoner must be analyzed under the *Turner* reasonableness standard." *Id.* at ——, 109 *S.Ct.* at 1881, 104 *L.Ed.*2d at 473.

The Court then declared that *Martinez'* "closer fit" analysis applies only to the regulations affecting *outgoing* correspondence—simply because that type of mail will always pose less of a threat to prison security than incoming materials. *Ibid.* Most significantly, it expressly disavowed *Martinez'* suggestion that a heightened standard of review applies when the constitutional rights of non-prisoners are at stake:

> To the extent that *Martinez* itself suggests a distinction [between incoming correspondence from prisoners and incoming correspondence from non-prisoners] we today overrule that case; the Court accomplished most of this step when it decided *Turner*.
> [*Id.*].

Applying the *Turner* reasonableness standard, the Court found the regulations constitutionally valid.

### III

In considering the constitutionality of the DOC regulations, we recognize the narrow scope of the issue before us. The Public Advocate challenges the regulations only to the extent that they do not treat incoming and outgoing mail to and from public officials, government agency officials and members of the media as privileged "legal correspondence." The Public Advocate does not challenge any regulations concerning inmate mail sent to or received from any other persons. Moreover, he does not challenge the definition of "disapproved content" or the procedures used to censor mail.

In analyzing the regulations we recognize that "[p]rison walls do not form a barrier separating prison inmates from the

protections of the Constitution." *Turner v. Safley, supra,* 482 *U.S.* at 84, 107 *S.Ct.* at 2259, 96 *L.Ed.*2d at 75. Those constitutional protections, however, must be counterbalanced against the "increasingly urgent problems of prison administration and reform." *Id.* at 84, 107 *S.Ct.* at 2259, 96 *L.Ed.*2d at 76 (quoting *Procunier v. Martinez, supra,* 416 *U.S.* at 405, 94 *S.Ct.* at 1807–08, 40 *L.Ed.*2d at 235). *Ibid.* As the Supreme Court recognized in *Turner,* internal order, discipline, security, and rehabilitation are legitimate goals that must be accommodated.

■ We consider first the standard of review we should employ in analyzing those DOC regulations affecting incoming inmate correspondence. *Thornburgh* makes clear that in choosing the appropriate standard of review, we do not consider whose rights are at stake, but rather the nature of the government interest. This impels us to conclude that the DOC regulations affecting *incoming* mail should be analyzed under *Turner's* reasonableness standard.

■ Central to the *Thornburgh* Court's analysis was that any materials *entering* a prison—publications or correspondence—pose a potentially greater risk of harm to institutional security than materials leaving a prison. *Thornburgh v. Abbott, supra,* 490 *U.S.* at ——, 109 *S.Ct.* at 1881, 104 *L.Ed.*2d at 473. In embracing the *Turner* standard to analyze the publication regulations, the *Thornburgh* Court drew from the "same concerns" at issue in *Turner*—which concerns centered on incoming *correspondence. Ibid.* Consistent with *Thornburgh,* we will analyze the DOC regulations affecting incoming correspondence under *Turner's* four-prong reasonableness test.

The first *Turner* factor focuses on whether the regulation is rationally related to a legitimate government objective. *Turner v. Safley, supra,* 482 *U.S.* at 89–90, 107 *S.Ct.* at 2261–62, 96 *L.Ed.*2d at 79. That requires an examination of the legitimacy and neutrality of the regulation. *Ibid.* The Appellate Division noted that the justification for the regulation undoubtedly rests on legitimate security concerns: "to (1) prevent the smuggling

of contraband, (2) check for escape plans, plans to harm some-
one or plans for some other criminal activity and (3) to prevent
materials from reaching inmates that might incite violence or
insurrection." 232 *N.J.Super.* at 490, 557 *A.*2d 698. Thus,
insofar as the regulations are "expressly aimed at protecting
prison security," and draw content-based distinctions "solely on
the basis of their potential implications for prison security," we
find that they are both "legitimate" and "neutral" within the
contemplation of *Turner*. *See Thornburgh v. Abbott, supra,*
490 *U.S.* at ——, 109 *S.Ct.* at 1882, 104 *L.Ed.*2d at 474.
Moreover, in our view, the regulation is carefully tailored
rationally to advance the goals of institutional security. Incom-
ing correspondence is opened only to check for contraband. It
is not routinely read and inspected unless there is "reason to
believe" it contains disapproved contents, and then only on prior
authorization of the Superintendent. *N.J.A.C.* 10A:18–2.6(g).
We conclude that a scheme allowing DOC to inspect incoming
material under those circumstances is a rational response to
legitimate peneological goals.

The second *Turner* factor asks whether there are "alternate
means of exercising the right that remain open to prison
inmates." *Turner v. Safley, supra,* 482 *U.S.* at 90, 107 *S.Ct.* at
2262, 96 *L.Ed.*2d at 79. The rationale underlying the *Thorn-
burgh* Court's analysis is applicable here: "[a]s the regulations
at issue ... permit a broad range of publications to be sent,
received, and read, this factor is clearly satisfied." *Thorn-
burgh v. Abbott, supra,* 490 *U.S.* at ——, 109 *S.Ct.* at 1884, 104
*L.Ed.*2d at 476. First, prisoners can send correspondence to
and receive it from their attorneys virtually without any restric-
tion. *N.J.A.C.* 10A:18–3.1 to 10A:18–3.13. Second, under our
finding with respect to regulations regarding outgoing mail to
public officials, government agency officials, and members of
the media, prisoners have easy and relatively uncensored access
to representations of those groups. *Infra* at 149–151, 576 A.2d
at 280–281. Third, prisoners may visit with family members,
close friends, clergy, and "persons who may have a construc-

tive influence on [ ] [them]," *N.J.A.C.* 10A:18–6.3, and with their attorneys, *N.J.A.C.* 10A:18–6.7. Hence, we conclude there exist reasonable communication alternatives under the current DOC regulatory scheme.

The third factor considered under *Turner* is the impact that accommodation of the asserted constitutional right will have on others, such as guards and inmates. *Turner v. Safley, supra,* 482 *U.S.* at 90, 107 *S.Ct.* at 2262, 96 *L.Ed.*2d at 79–80. Here, the incoming mail that is opened and inspected is that which the officials have "reason to believe" contains disapproved content—the very type of materials that are likely to cause the "ripple effect" in the institution with which the *Turner* court was concerned. *Id.* at 90, 107 *S.Ct.* at 2262, 96 *L.Ed.*2d at 80. Where, as in *Thornburgh,* the right " 'can be exercised only at the cost of significantly less liberty and safety for everyone else, guards and other prisoners alike, * * * the courts should defer to the informed discretion of corrections officials.' " *Thornburgh v. Abbott, supra,* 490 *U.S.* at ——, 109 *S.Ct.* at 1884, 104 *L.Ed.*2d at 476 (citing *Turner v. Safley, supra,* 482 *U.S.* at 90–92, 107 *S.Ct.* at 2262–63, 96 *L.Ed.*2d at 79–80).

Finally, the existence of readily-available, obvious alternatives is evidence of the reasonableness of a regulation. *Turner v. Safley, supra,* 482 *U.S.* at 90, 107 *S.Ct.* at 2262, 96 *L.Ed.*2d at 80. Hence, if an alternative "fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests," *id.* at 91, 107 *S.Ct.* at 2262, 96 *L.Ed.*2d at 80, it may demonstrate that the regulation is unreasonable. The Appellate Division offered an alternative: "[incoming correspondence from public officials, government agencies and news media] should be inspected for contraband only in the presence of the inmate addressee, with the caveat that individuals or agencies who send mail to a prisoner may be required to properly identify themselves and their status before the mail reaches the prisoner." 232 *N.J.Super.* at 490, 557 *A.*2d 698. We disagree, however, that that alternative can be accomplished at a *de minimis* cost to DOC's interests. As the DOC points out, legal

mail is currently processed in a time-consuming manner, in that it can be opened and inspected for contraband only in the presence of the inmate. It is unrealistic to add public officials, government agencies, and media representatives to that privileged category and to expect corrections personnel to distribute mail in one business day, as the regulations require. *See N.J.A.C.* 10A:18–2.12(a). Nor can we easily conclude that requiring DOC to open and inspect a greater amount of mail in the presence of each inmate while maintaining security in the institution at current levels could be accomplished at a *de minimis* cost. Moreover, even if we were to assume that such accommodation could be accomplished, that accommodation would be insufficient for us to conclude, in context of this correspondence scheme, that the regulation is wholly unreasonable.

We also note that the regulations treat all incoming mail similarly, except that they provide special protection to "incoming legal correspondence." *N.J.A.C.* 10A:18–3.4. In this regard, the regulations are consistent with federal constitutional requirements. *See Wolff v. McDonnell,* 418 *U.S.* 539, 574–75, 94 *S.Ct.* 2963, 2983–84, 41 *L.Ed.*2d 935, 961–63 (1974). Hence, we conclude that the current DOC regulations regarding incoming mail are "reasonably related to legitimate penological interests," *Thornburgh v. Abbott, supra,* 490 *U.S.* at ——, 109 *S.Ct.* at 1881, 104 *L.Ed.*2d at 473 (quoting *Turner v. Safley, supra,* 482 *U.S.* at 89, 107 *S.Ct.* at 2261, 96 *L.Ed.*2d at 79), and pass scrutiny under our federal constitution.

## IV

■ We next consider the constitutionality of those DOC regulations affecting *outgoing* inmate mail, specifically *N.J. A.C.* 10A:18–2.7. When the Public Advocate filed this appeal, the regulations provided that only outgoing legal correspondence, or correspondence addressed to certain state officials or government agencies could not be opened, read, or censored. *N.J.A.C.* 10A:18–2.7(b). Subsequently, the DOC amended that

regulation to include the federal counterparts of the state officials. See 21 *N.J.R.* 1014. As the Appellate Division stated, "it would seem then that a portion of appellant's complaints have been solved." 232 *N.J.Super.* at 484, 557 *A.*2d 698. Nonetheless, on this appeal we will consider whether *N.J.A.C.* 10A:18–2.7(b) must be expanded to include a broader category of public officials, government agency officials as well as media representatives as privileged mail recipients.

We first consider the standard of review we should employ to analyze regulations affecting outgoing correspondence. In *Thornburgh v. Abbott, supra,* the Court upheld the "closer fit" analysis of *Martinez* to regulations governing outgoing mail, reasoning that outgoing mail "[does] not, by its very nature, pose a serious threat to prison order and security." 490 *U.S.* at ———————, 109 *S.Ct.* at 1880, 104 *L.Ed.*2d at 471–72 (footnote omitted). In our view, under either the heightened standard of *Martinez* or the more deferential approach of *Turner,* the regulations concerning outgoing mail do not pass constitutional muster.

Measured against the *Martinez* standard, the regulations clearly fail. In *Martinez,* the Court developed a two-prong test to analyze the California penal regulation affecting outgoing mail: (1) the regulation must further a substantial government interest; and (2) that regulation must be no greater than necessary to protect that government intent. *Procunier v. Martinez, supra,* 416 *U.S.* at 413, 94 *S.Ct.* at 1811, 40 *L.Ed.*2d at 240. Hence, *Martinez* require[s] a "close fit between the challenged regulation and the interest it is purported to serve." *Thornburgh v. Abbott, supra,* 490 *U.S.* at ———, 109 *S.Ct.* at 1880, 104 *L.Ed.*2d at 471. While the regulations undoubtedly advance the important government interest of institutional security, satisfying the first prong, we find that they are greater than "generally necessary" to satisfy that interest. *Procunier v. Martinez, supra,* 416 *U.S.* at 414, 94 *S.Ct.* at 1812, 40 *L.Ed.*2d at 240; *Thornburgh v. Abbott, supra,* 490 *U.S.* at ———, 109 *S.Ct.* at 1880, 104 *L.Ed.*2d at 471. The regulations fail to

reflect the minimal security risk posed by outgoing mail. Unlike incoming mail, outgoing mail that contains inflammatory views does not present a danger to the population *within* the prison. Although outgoing mail can nonetheless contain dangerous material—escape plans, plans relating to ongoing criminal activity and threats of blackmail or extortion, *Thornburgh v. Abbott, supra,* 490 *U.S.* at ——, 109 *S.Ct.* at 1880, 104 *L.Ed.*2d at 472, that threat is minimal when we consider the proposed audience: legitimate public officials, government agencies, and members of the media.

We also note that against such minimal security risks, rests the significant free-speech rights of inmates. Outgoing correspondence to public officials, government agencies and media representatives may contain personal grievances concerning the institution, conditions of confinement and unlawful or criminal activity. In our view, including those groups in the category of outgoing mail that is not subject to censorship best accommodates the security concerns of the institution and the first-amendment rights of the inmates.

We find that the regulations affecting outgoing mail are constitutionally infirm under *Turner*'s reasonableness test as well. The third factor addressed under *Turner* is the impact that the accommodation of the asserted right will have on others, *Turner v. Safley, supra,* 482 *U.S.* at 90, 107 *S.Ct.* at 2262, 96 *L.Ed.*2d at 79–80; or stated differently, whether accommodation of the right will have a significant "ripple effect" on others at the institution. *Id.* at 90, 107 *S.Ct.* at 2262, 96 *L.Ed.*2d at 80. Unlike *Thornburgh,* in which the Court observed the "likelihood that [incoming] materials will circulate within the prison ... [and cause a] 'ripple effect'," 490 *U.S.* at ——, 109 *S.Ct.* at 1884, 104 *L.Ed.*2d at 476, that type of threat is not posed by outgoing mail. Moreover, any potential threat that may exist is slight and is clearly outweighed by the interest in protecting that mail from restriction.

Finally, the existence of "obvious easy alternatives," which can be accommodated at a *de minimis* cost to valid penological

interests, may be evidence that the regulation "is not reasonable but is an 'exaggerated response' to security concerns." *Thornburgh v. Abbott, supra,* 490 *U.S.* at ——, 109 *S.Ct.* at 1884, 104 *S.Ct.* at 476 (quoting *Turner v. Safley,* 482 *U.S.* at 90–91, 107 *S.Ct.* at 2262, 96 *L.Ed.*2d at 80). In concluding that the current regulations regarding outgoing mail were invalid, the Appellate Division suggested that "prison officials should be allowed a reasonable time to ascertain that the addressee is a legitimate member of the press [or other media agency.]" 232 *N.J.Super.* at 490, 557 *A.*2d 698. We agree that including outgoing mail to public officials, government agencies and media representatives in the category of privileged legal correspondence, and adopting the Appellate Division's safeguard, is a reasonable alternative which can be accomplished at a *de minimis* cost to DOC.

Hence, we conclude that *N.J.A.C.* 10A:18:2–7 is constitutionally deficient insofar as it prevents inmates from sending outgoing correspondence to public officials, government agencies, and media representatives unopened and uncensored. We note that DOC has proposed a regulation regarding outgoing mail, 21 *N.J.R.* 3913, setting forth a comprehensive list of public officials, government-agency officials, and an undefined category of news media representative as privileged mail recipients. Such a comprehensive list would obviate any of the administrative concerns that DOC now has about verifying the genuineness of the addressee's status. The proposed regulation also states that mail to those persons may be held "long enough to verify that the addressee is a legitimate public official, government agency official or news media representative." *Ibid.* We find that this proposed regulation concerning outgoing inmate mail meets the federal-constitutional standard.

## V

We conclude that the existing DOC regulation regarding incoming inmate mail, *N.J.A.C.* 10A:18–2.6, is constitutionally

valid, under the standards set forth in *Turner* and *Thornburgh*. We find, however, that the existing DOC regulation regarding outgoing inmate mail, *N.J.A.C.* 10A:18–7–2.7, is constitutionally deficient and should be amended to conform with this opinion.

The judgment of the Appellate Division is affirmed in part and reversed in part.

*For Affirmance in part and For Reversal in part*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.