633 A.2d 964

L.T., PETITIONER–APPELLANT, v. NEW JERSEY DEPARTMENT OF HUMAN SERVICES, DIVISION OF FAMILY DEVELOPMENT, RESPONDENT–RESPONDENT.

L.W., PETITIONER–APPELLANT, v. NEW JERSEY DEPART-MENT OF HUMAN SERVICES, DIVISION OF FAMILY DEVELOPMENT, RESPONDENT–RESPONDENT.

L.M., PETITIONER–APPELLANT, v. NEW JERSEY DEPART-MENT OF HUMAN SERVICES, DIVISION OF FAMILY DEVELOPMENT, RESPONDENT–RESPONDENT.

J.W., PETITIONER–APPELLANT, v. NEW JERSEY DEPARTMENT OF HUMAN SERVICES, DIVISION OF FAMILY DEVELOPMENT, RESPONDENT–RESPONDENT.

M.M., PETITIONER–APPELLANT, v. NEW JERSEY DEPART-MENT OF HUMAN SERVICES, DIVISION OF FAMILY DEVELOPMENT, RESPONDENT–RESPONDENT.

Argued October 13, 1993—Decided December 15, 1993.

*Cary L. Winslow,* practicing pursuant to *Rule* 1:21–3(c), argued the cause for appellants (*John D. Atlas,* Executive Director, Passaic County Legal Aid Society, attorney; *Mr. Winslow, Madeline L. Houston, Robert M. Pallitto,* and *Donald V. Romaniello,* on the brief).

*Dennis J. Conklin,* Senior Deputy Attorney General, argued the cause for respondent (*Fred DeVesa,* Acting Attorney General, attorney).

*Melville D. Miller, Jr.,* President, argued the cause for *amicus curiae* Legal Services of New Jersey (*Mr. Miller,* attorney; *Mr. Miller, David G. Sciarra,* Senior Attorney, and *Leighton Holness,* Senior Attorney, on the brief).

*Susan R. Oxford,* Assistant Deputy Public Advocate, argued the cause for *amicus curiae* Public Advocate of New Jersey (*Zulima V. Farber,* Public Advocate, attorney).

*John M. Payne* submitted a brief on behalf of *amicus curiae* American Civil Liberties Union of New Jersey.

The opinion of the Court was delivered by

O'HERN, J.

This appeal concerns the rights of persons facing eviction and homelessness to receive extensions of temporary rental assistance (TRA) under the State's General Public Assistance Law, *N.J.S.A.* 44:8–107 to –157 (GA Law). "The [GA] [L]aw exists 'to the end that * * * person[s] may not suffer unnecessarily, from cold, hunger, sickness or be deprived of shelter * * *.'" *Pascucci v. Vagott,* 71 *N.J.* 40, 48, 362 *A.*2d 566 (1976) (quoting *N.J.S.A.* 44:8–122). TRA provides a twelve-month rent supplement to eligible GA recipients to prevent homelessness. The case arises from respondent's refusal to continue TRA, in essence, forcing the eviction and consequent homelessness of these claimants. The

question in this appeal, most broadly stated, is whether the Legislature intends that administration of the GA Law, by setting a twelve-month expiration period for TRA, should result in the homelessness of the very persons whom the law is intended to shelter. We think not. We therefore direct that the agency continue TRA for individuals facing homelessness to the extent of available appropriations, unless it identifies another governmental agency or program that will provide shelter for such persons.

# I

## A.

For purposes of this appeal, we generally accept the procedural history and statement of facts as set forth in the briefs of the Department of Human Services (DHS). We add something of the circumstances that brought each of these five persons to the verge of homelessness. For the most part, they were working men who were experiencing difficult times. The status of many other GA recipients is often misperceived by the public:

[S]tereotypes of GA recipients are ill-founded and incorrect. Those who stereotype recipients as generally men in their 20's and 30's who have trouble keeping a job ignore those individuals who are chronically unemployed or underemployed and those with chronic health problems who have barriers that prevent them from maintaining employment.

\*     \*     \*     \*     \*     \*     \*     \*

The [GA] population is very diverse. It ranges from the 18 year old high school drop out with virtually no work history who is unable to find a job in the current economy; to the 40 year old former factory worker who was laid off as a result of down sizing, has now exhausted his/her unemployment benefits and finds his/her 20 years of assembly line experience to be in little demand; to the 50 year old with a graduate degree who is unable to find work; to the 63 year old alcoholic who is too ill to work but not considered to be disabled by the Social Security Administration. For these people and thousands of others with somewhat different stories, the GA program represents their last hope, the final shred of the safety net.

[William Waldman, Commissioner of Department of Human Services, *A Special Report to the Legislature on General Assistance* 1, 7 (April 1993) (hereinafter *Report to the Legislature*).]

Petitioners, Larry Tillman, Lee Wilkins, Leonard McMahon, John White, and Martin Malcolm (fictitious names), all resided in

Paterson and received $140 each in monthly GA benefits from the Paterson Municipal Welfare Agency (MWA). At various times, the Paterson MWA granted each petitioner emergency assistance (EA) benefits in the form of TRA to prevent petitioners from becoming homeless. The MWA placed petitioners in the Paterson YMCA, which charged $352 in monthly rent. Petitioners paid $105 of the rent out of their $140 monthly GA benefits, and the MWA made up the difference of $247 through TRA grants. While receiving TRA, all five petitioners participated in the GA employment program, which required them to seek affordable housing, employment, disability benefits, and other assistance. Their efforts met with no success. After each petitioner had been receiving TRA for at least one year, the MWA sought to terminate each petitioner's TRA benefits solely on the basis that DHS regulations limit the duration of TRA to one year. *N.J.A.C.* 10:85–4.6(e)2iii(5).

Petitioner Larry Tillman is a fifty-seven-year-old man who suffers from numerous health problems including arthritis. The Paterson MWA placed him in the Paterson YMCA because he was homeless. Despite his age and medical difficulties, the MWA classified Mr. Tillman as "employable." As a result, Mr. Tillman received the lower of the two available "flat grants" and was required to participate in the GA employment program. During the time that he lived at the YMCA, Mr. Tillman actively sought affordable housing, disability benefits, and a Passaic County Housing Authority rental subsidy. The Paterson MWA did not assist Mr. Tillman in those endeavors in any significant way. Currently, Mr. Tillman is receiving federal supplemental security income (SSI), which provides him with enough money to pay for an apartment even though he is no longer receiving either GA or TRA.

Petitioner Lee Wilkins suffers from chronic asthma and bronchitis. However, as with Larry Tillman, the MWA classified Mr. Wilkins as "employable." During the course of this appeal, Mr. Wilkins applied for Social Security and federal disability benefits, as well as a federal subsidy that was apparently earmarked for

rooms at the Paterson YMCA. At the time of oral argument, Mr. Wilkins had been in a drug-rehabilitation center for almost two months. He had been evicted from the YMCA for non-payment of rent after termination of his TRA benefits.

Petitioner Leonard McMahon, a forty-seven-year-old man, worked in the construction industry for twenty-five years before being laid off when that work slowed down during the recession. Sometime after his unemployment benefits had expired, Mr. McMahon developed difficulties with his pancreas that required hospitalization. Following treatment for his medical problem, Mr. McMahon was discharged from the hospital with no money and nowhere to live. As a result, the MWA granted him GA and TRA, and he took up residence at the Paterson YMCA. Although Mr. McMahon continues to suffer from pancreas and liver problems, the MWA considers him "employable" and requires him to participate in the GA employment program. While receiving TRA, Mr. McMahon attempted unsuccessfully to obtain affordable housing and employment. During the pendency of this appeal, he applied for Social Security and federal disability benefits. At oral argument, counsel indicated that Mr. McMahon was giving his GA grant and his food stamps to friends in exchange for housing since the termination of his TRA benefits.

Petitioner John White was awarded GA when his unemployment benefits were terminated. He lived at a shelter for homeless people until the MWA granted him TRA and placed him at the YMCA. While receiving TRA, Mr. White actively sought affordable housing and employment in Bergen and Passaic Counties. Those efforts met with failure. Similarly, Martin Malcolm also sought, unsuccessfully, affordable housing and employment during the time he was receiving TRA.

Last month, we reviewed DHS's denial of an extension of TRA benefits to another client of the Paterson MWA. James Saltano (fictitious name) is a forty-eight-year-old single male. He has a sixth-grade education; he is mildly retarded; and his health precludes him from doing the manual labor he once performed.

DHS terminated Mr. Saltano's assistance because the regulation called for such termination. Mr. Saltano is probably homeless.

## B.

The GA program is directly administered by municipal welfare departments (MWDs) in accordance with regulations and directives of the Division of Family Development (DFD) (formerly known as the Division of Economic Assistance), which is a part of DHS. Regulations of the Commissioner of Human Services governing the administration of GA are set forth at *N.J.A.C.* 10:85–1.1 to –12.2.

Those regulations incorporate an assortment of benefits and services to assist homeless persons. Those programs include EA, *N.J.A.C.* 10:85–4.6(a), and TRA, *N.J.A.C.* 10:85–4.6(e)2. (For convenience, we use the terminology of the DHS, which distinguishes between EA and TRA even though TRA is actually one form of EA, as indicated by the fact that the TRA provisions are found in the EA regulations.)

EA comprises the GA program's quick-response, short-term mechanism for the provision of shelter to those who have lost or are about to lose their housing due to some emergency or unavoidable mishap. EA commonly involves placement in motels. We reviewed that program in *Williams v. Department of Human Services,* 116 *N.J.* 102, 561 *A.2d* 244 (1989) (*Williams* I). At issue in that case was the validity of a regulation that terminated EA at five months. Recognizing that placement of homeless persons in motels was the most demeaning and least cost-effective method of dealing with problems of homelessness, we held that a five-month limit on such benefits was reasonable, provided that the agency established programs that would make it reasonably certain that homeless persons would find shelter elsewhere.

One of the additional programs designed to avert homelessness was the TRA program, *N.J.A.C.* 10:82–4.6(e)2. TRA constitutes a comprehensive, longer-term approach to the problem of homelessness. Under the TRA program, qualifying GA recipients may

receive rental subsidies of $200 per month or more for up to a year. Because TRA may be "tacked on" to a grant of EA, eligible persons can and, in many cases, do receive combinations of EA and TRA for continuous periods of seventeen months and longer. At the commencement of a TRA grant, DHS gives a recipient notice of the subsidy's duration and advises the recipient that he or she is expected during that period to eliminate his or her dependence on the subsidy. In the Commissioner's view, the regulations do not provide for extensions of TRA beyond twelve months; however, in a large number of cases since the formal institution of the TRA program DHS has granted individual discretionary extensions of TRA. DHS granted each petitioner in this case an extension, but ultimately DHS issued final decisions at different times declining to grant further extensions. Petitioners appealed to the Appellate Division. Determining that petitioners had exhausted their rights to TRA, that court affirmed the decisions of DHS. 264 *N.J.Super.* 334, 624 *A.*2d 990 (1993).

The Appellate Division disagreed with petitioners' contention that termination of their TRA benefits violated the GA Law as interpreted by this Court in *Williams* I, *supra*, 116 *N.J.* 102, 561 *A.*2d 244, reasoning that "the shelter scheme which appellants now attack was thoroughly explored and evaluated by the ALJ and the Commissioner and approved by the Supreme Court in *Williams* III [121 *N.J.* 667, 583 *A.*2d 351 (1990) ]." 264 *N.J.Super.* at 338, 624 *A.*2d 990. The court rejected petitioners' contention that they have a right to shelter under article I, paragraph 1 of the New Jersey Constitution. *Id.* at 342, 624 *A.*2d 990. The court also rejected petitioners' claim that they were entitled to continue receiving TRA under DHS's own regulations, specifically *N.J.A.C.* 10:85–4.6(e)3, reasoning that that provision was textually confined to extensions of EA hotel/motel placements rather than TRA rent subsidies. Finally, the court held that DHS did not abuse its discretion in refusing further extensions of petitioners' TRA benefits. 264 *N.J.Super.* at 343, 624 *A.*2d 990.

We granted the petitions for certification, 134 *N.J.* 480, 634 *A.*2d 527 (1993).

## II

### A.

We need not now repeat in detail the observations that we made in *Williams* I, *supra*, 116 *N.J.* 102, 561 *A.*2d 244, concerning the express and implied legislative policies that underlie our GA program. GA is considered a residual or last-resort program under which aid is available to needy persons between eighteen and sixty-five years of age who have no minor children. Other needy persons in our society are eligible for what is called "categorical" welfare aid, such as Old Age Assistance, Aid to the Blind, Disability Assistance, Aid to Families with Dependent Children, or Aid to Families of the Working Poor. GA assists those people who are not eligible for such categorical aid. As of 1988, approximately 20,000 people received benefits through the GA program. Today, GA is extended to some 38,000 recipients.

In *Williams* I, *supra*, 116 *N.J.* 102, 561 *A.*2d 244, we reviewed the three categories of GA relief. "Immediate public assistance" is "interim relief pending full investigation of [GA] eligibility." *Id.* at 111, 561 *A.*2d 244. The second form of assistance is "continued assistance," which is basically a flat grant for recipients. *See In re Rulemaking, N.J.A.C. 10:82–1.2,* 117 *N.J.* 311 (1989). The flat grant is $140 per month for employable persons and $210 per month for unemployable persons. *N.J.A.C.* 10:85–4.1(b). The final category of GA is "EA," which includes the TRA benefits that are at issue in this case and the welfare-hotel program that was at issue in *Williams.*

At the time of the *Williams* decision, we recognized that costs for shelter of one person in a privately-owned motel could reach as high as $2,000 per month. *Williams* I, *supra*, 116 *N.J.* at 114, 561 *A.*2d 244. Governor Kean had observed, " 'there is a better way to use tax dollars than to line the pockets of a few fortunate hotel

owners.'" *Id.* at 124, 561 *A.*2d 244 (quoting Gov. Thomas H. Kean, *Annual Message to the Legislature: New Jersey's Quiet Revolution* 106 (1989)). We agreed that every effort should be made to get recipients off of the EA program because of its extraordinary expense. At the same time, we concluded that the statutory program was not intended to be administered to bring about the very homelessness that the law is designed to avert.

This plain legislative purpose led the Appellate Division in *Williams* I to conclude that "[a] reading of the entire GA law inescapably leads one to the conclusion that it mandates *continuing* assistance to needy persons as long as that need exists, albeit within the restraints of the fiscal appropriations allocated." 228 *N.J.Super.* 529, 538–39, 550 *A.*2d 505 (1988). Thus, we held that the five-month limit on the inordinately expensive payments to motels and hotels under the EA program was a valid exercise of the Commissioner's authority if by December of that year the Commissioner had set programs in place that would "'make reasonably certain that [the persons] previously housed in motels will find shelter and eventually housing elsewhere.'" *Williams* I, *supra,* 116 *N.J.* at 125, 561 *A.*2d 244 (quoting *Franklin v. Department of Human Servs.,* 111 *N.J.* 1, 20, 543 *A.*2d 1 (1988)).

## B.

At the time of *Williams* I, some degree of misunderstanding had existed about which agency of government "is ultimately responsible to provide shelter of last resort to the GA homeless." 116 *N.J.* at 121, 561 *A.*2d 244. At that time, fiscal responsibility for the GA program was divided between the State (75%) and the municipalities (25%). *Id.* at 105 n. 1, 561 *A.*2d 244. The role of county government remained uncertain. Then–Commissioner Altman suggested that "'[i]n New Jersey, services for the homeless have historically been a county and local responsibility.'" *Id.* at 121, 561 *A.*2d 244 (quoting D. Altman, Commissioner of Department of Human Services, *Report to the Legislature* 2 (Mar. 10, 1988)). Hence, we had assumed that the final product of DHS's

administrative process would (1) "clarif[y] * * * which agency has the ultimate responsibility to provide shelter of last resort"; (2) specify what funds were to be available to local agencies for the desired "rent subsidy" program; (3) explain what "supervising responsibility" DHS would assume and whether "State shelters" would be available after the expiration of allotted benefits; and (4) detail how the $2.4 million in funds then allocated to fight homelessness would be spent. *Id.* at 121–23, 561 *A.*2d 244. We had assumed that those programs would fulfill Governor Kean's intent that "every citizen of New Jersey has a place to go where they must take you in." *Id.* at 124, 561 *A.*2d 244. We had recognized that

> government cannot achieve the impossible and that despite the best of efforts, some people will indeed slip through the [safety] net. But it should not be because there has been an administrative misunderstanding about the respective roles of the agencies of government and the programs that they administer. The danger that we face with the depersonalization of government is that program manuals, and not people, will decide when government can do no more.

> [*Id.* at 123, 561 *A.*2d 244.]

Responding to those concerns, DHS commendably undertook a series of initiatives designed to make reasonably certain that the EA claimants would find temporary shelter and, eventually, permanent housing elsewhere.

Just prior to the deadline imposed by the Court, Legal Services of New Jersey and the Public Advocate, acting on behalf of GA/EA recipients who would be rendered homeless by the DHS time limits, moved to defer entry of judgment on the ground that the DHS had failed effectively to implement the safety-net programs within the time that the Court specified. *Williams v. Department of Human Servs.*, 121 *N.J.* 589, 583 *A.*2d 297 (1989) (*Williams* II). Because a factual dispute remained, we remanded the case to DHS. DHS, in turn, referred the case to the Office of Administrative Law "for the development of a record that would permit an informed decision" on whether it was " 'reasonably certain that [EA claimants] previously housed in motels will find

shelter and eventually housing elsewhere.'" *Ibid.* (quoting *Williams* I, *supra*, 116 *N.J.* at 125, 561 *A.2d* 244).

Following an extensive hearing on DHS's implementation of its safety-net program, Chief Administrative Law Judge (ALJ) La-Vecchia issued her final decision. Her decision incorporated the premise of *Williams* I that the Legislature intended the GA Law to impose a continuing obligation to provide shelter to GA-eligible individuals. As explained in *Williams v. Department of Human Services*, 121 *N.J.* 667, 583 *A.2d* 351 (1990) (*Williams* III), the Chief ALJ found that the DHS safety net would meet the *Williams* I standard only if a rulemaking specified which government entity is responsible for ensuring that GA/EA recipients continue to have shelter after the expiration of their benefits. She observed that "the success of the safety net to [that] date [was] in large part due to the sheer energy and drive of the small State staff led by Director Reitz who are dedicated to insuring that this vulnerable and, at times, unsympathetic population is sheltered."

One of the provisions of the safety net that the Chief ALJ relied on in her findings was the TRA program that is at issue in this case. She noted that TRA was limited to twelve months, and that the needs of those GA/EA recipients who might reach this limit and still need shelter posed "a nagging question in need of definitive resolution by the DHS."

In his final decision of March 1, 1990, then-Acting Commissioner of Human Services William Waldman adopted the findings of the Chief ALJ and agreed that the agency must resolve through rulemaking the manner in which GA recipients could obtain continuing shelter at the expiration of the twelve-month TRA period. In essence, he agreed that "[t]he issue of what happens to a client at the close of his or her twelve months of post-EA rent subsidy needs resolution."

C.

Based on the Commissioner's acceptance of those findings and recommendations and because the agency had instituted rulemak-

ing, we entered final judgment on April 4, 1990, "conditioned on adoption of the proposed regulations." *Williams* III, *supra,* 121 *N.J.* at 668, 583 *A.*2d 351.

Thereafter, DHS officially proposed an amended GA/EA regulation, *N.J.A.C.* 10:85–4.6. The summary of the proposal for an amended regulation emphasized that it had been "developed in support of the New Jersey Supreme Court's [*Williams* I] decision." 23 *N.J.R.* 1178 (Apr. 15, 1991). Although couched in the familiar language of modern governmental programs, in the words of Legal Services of New Jersey,

> [t]he regulation is far more than just a vehicle for providing emergency shelter. It embodies four key elements: (1) the MWD must provide ongoing emergency shelter assistance to address the recipient's immediate homelessness; (2) while emergent shelter needs are being met, the MWD must attempt to resolve the recipient's homelessness by securing permanent housing affordable without EA, and the recipient must search for housing; (3) the MWD must provide services necessary to enable the recipient to afford housing, and the recipient must cooperate in the effort to resolve his or her emergency; and (4) any resources which may be available from other agencies—both public and private—must be effectively coordinated in a comprehensive effort to resolve the recipient's homelessness.

Put in context, what that regulation means to us is that the MWDs, which are now the agencies of choice to administer the State GA program, have the responsibility to see that the homeless receive shelter. The local departments can attack homelessness in a variety of ways. Private agencies can help without any expenditure of State funds. For example, the Paterson YMCA, by providing low-cost housing, is a generous assistant to the needs of government. However, the ability of such private nonprofit organizations to absorb the housing needs of the homeless has limits. Thus, a program such as TRA, which pays a moderate rental assistance, seems most desirable. Counsel for the American Civil Liberties Union of New Jersey, citing data from the brief of Legal Services of New Jersey, observed in his brief that "TRA has apparently resulted in a spectacularly cost-effective shift from expensive and dysfunctional 'welfare motels,' at an average cost of $1,487 per month, to rental assistance for conventional living quarters at an average cost of $289 per month." Many GA

recipients are poorly informed of the benefits for which they are eligible. They may not be receiving necessary food stamps. They may have visual impairments or other disabilities that would make them eligible for disability benefits under the federal Social Security statutes. Taken together, a package of benefits might enable these persons to find shelter on their own. Because such supplemental benefits might be available, the regulations require the MWDs, "within five working days of the EA authorization date, to provide an individualized plan of action aimed at working toward securing permanent shelter and also, where directly related to securing such shelter, at *resolving the circumstances* that contributed to his or her emergency situation." *N.J.A.C.* 10:85–4.6(c)5 (emphasis added). That requirement of "an individualized plan of action" contemplates more than mere formalism. The regulations contemplate a wise counselor examining the individual needs of the EA recipient, mapping out a plan to resolve the circumstances that produced the individual's homelessness, and steering the client through the bureaucratic thickets of other programs.

The record displays the sterile written service plans generated for some of the petitioners. Such plans appear to us to be little more than an exercise in formalism: "fill out the forms and the job is done." The following excerpt from the transcript of the ALJ hearing regarding the termination of petitioner Larry Tillman's TRA benefits demonstrates the inadequacy of the Paterson MWA's service plans:

Attorney for Petitioner (Attorney):

Has she [Mr. Tillman's caseworker] developed a written service plan with Mr. [Tillman] explaining what—has she developed any type of written service plan with him?

Paterson Municipal Welfare Director (MWD):

I believe that was done prior to her taking over the caseload.

Attorney: Okay. Do you have that in your file?

MWD: I think so. * * *

   *    *    *    *    *    *    *    *

Attorney: * * * [H]as that plan been signed by Mr. [Tillman]?

MWD: No.

Attorney: It hasn't been, okay. Does the plan talk about his specific circumstances, what his problems are?

MWD: Problems such as what, housing?

Attorney: Problems that would—that would lead to homelessness in his case, his particular case?

MWD: No.

Attorney: Okay. What does that plan say the approach will be to dealing with his homelessness and getting him into permanent housing?

MWD: Well, it's a two-party contract, the Agency and Mr. [Tillman] is supposed to be looking for alternat[ive] housing.

Attorney: Okay. But what does the plan say about what his—what his attack will be? How he's going to combat homelessness—and homelessness in this case?

        \*      \*      \*      \*      \*      \*      \*      \*

MWD: Well, he's supposed to search for alternat[ive] housing.

        \*      \*      \*      \*      \*      \*      \*      \*

Attorney: Is there anything else in there to that end explaining how he's going to secure permanent housing?

MWD: Well, we are also supposed to help.

Attorney: Okay, what does the plan say that you are going to do?

MWD: It just says, "The Municipal Welfare Department should develop a service plan to address his emergency shelter situation."

        \*      \*      \*      \*      \*      \*      \*      \*

Attorney: But as far as you can find in the file, there is no written plan that deals with this subject of how he's going to deal with his homelessness?

MWD: I don't understand what you mean by written plan.

Attorney: Well, you just read—

MWD: This is the service plan.

Attorney: —from the paper that you were reading, you said, a written service plan should be developed. And I'm asking you whether it ever has been developed.

MWD: This is the service plan.

Attorney: I'm just—I'm just repeating what you just read. You said, the agency will develop a written service plan.

MWD: Which is this, this is the plan.

Attorney: Okay. But that plan is not at all specific about what's suppose [sic] to happen. It just says he will search for cheaper housing.

MWD: (No audible response.)

One of the current deficiencies in the GA program is the lack of incentives for those administering the program to administer the program efficiently. After we decided *Williams* I, *supra,* 116 *N.J.*

102, 561 *A*.2d 244, the Legislature amended the GA Law to require the State to bear the entire GA program cost; only administration costs continue to be borne at the municipal level. *L.* 1990, *c.* 66, § 17 (codified at *N.J.S.A.* 44:8–114). Thus, the municipal administrators of GA have little incentive to administer the program efficiently.

Consider the cases of these petitioners who remained on TRA for as long as twenty-two months. Larry Tillman, for example, began receiving TRA in May 1991. By December 1992, he was receiving SSI, which is a federal subsidy for elderly or disabled people, and was no longer receiving TRA. Assuming that Larry Tillman was eligible to receive SSI at an earlier date, prompt recognition of such eligibility could have saved the State as many as eighteen months of TRA. Mr. Tillman's service plan should have required continuing efforts to "coordinate support services," such as SSI, to avert homelessness. *N.J.A.C.* 10:85–4.6(c). DHS Commissioner Waldman recently reported to the Legislature that the MWDs are not making a sufficient effort to assist GA recipients in acquiring other benefits for which they are eligible:

> It is apparent that there is a need for more aggressive pursuit of these [other] benefits on behalf of GA clients. From a programmatic point of view, MWDs need to ensure that all those individuals who are potentially eligible for benefits make application and are assisted in that endeavor. It is also apparent that a case management component needs to be added to ensure that applicants follow through with the approval process and receive assistance with appeals if necessary.

[*Report to the Legislature, supra,* at 14.]

We intend no criticism of the local officials in these cases. Their municipalities may not have or may not be willing to commit the resources to administer effectively the delegated State GA program.

Consistent with statutory purpose, the Commissioner would presumably, when the record demonstrates no want of effort by the claimant, continue TRA. The Commissioner insists, however, that he lacks the authority to do so because TRA has a twelve-month expiration period. He maintains that *N.J.A.C.* 10:85–4.6(e)3, which allows month-by-month extensions of EA, does not

· apply to TRA. That the Legislature would intend to continue payments of $2000 a month but not payments of $200 a month suggests a measure of inconsistency; however, we must conclude that on its face *N.J.A.C.* 10:85–4.6(e)3 does not appear to authorize extensions for TRA. The language of the regulation speaks of "[m]onthly EA shelter extensions beyond the five-month maximum." The use of the term "EA" rather than "TRA" and the reference to a five-month maximum rather than a twelve-month maximum indicates that the agency intended that extension provision to apply only to the welfare hotel/motel form of EA, not to TRA. That conclusion is supported by the fact that *N.J.A.C.* 10:85–4.6(e)2, which provides for TRA, and the extension provision were proposed and adopted at the same time. 22 *N.J.R.* 2078, 2081 (July 16, 1990); 23 *N.J.R.* 1177, 1190 (Apr. 15, 1991). Because DHS proposed and adopted the TRA provision and the EA extension provision at the same time, one would have expected the agency to use the term "TRA" in the extension provision if it had intended that provision to apply to TRA benefits. We must therefore confront the question whether the twelve-month expiration period is a valid exercise of agency authority.

### III

We begin by acknowledging that our function is not to second-guess an agency of government about how it shall best implement a legislative program. *Barone v. Department of Human Servs.*, 107 *N.J.* 355, 369–70, 526 *A.*2d 1055 (1987). In any review of agency action the fundamental rule is that a court may not substitute its judgment for the expertise of an agency "so long as that action is statutorily authorized and not otherwise defective because arbitrary or unreasonable." *Dougherty v. Department of Human Servs.*, 91 *N.J.* 1, 12, 449 *A.*2d 1235 (1982). Courts act only in those rare circumstances in which the agency action is clearly inconsistent with its legislative mandate. Ordinarily, the judicial role is restricted to three inquiries: (1) whether the agency's action violated the enabling act's express or implied

legislative policies; (2) whether the evidence in the record provides insubstantial support for the findings on which the agency based its actions; and (3) whether, applying the legislative policies to the facts, the agency clearly erred by reaching a conclusion that could not reasonably have been made after weighing the relative factors. *Campbell v. Department of Civil Serv.*, 39 *N.J.* 556, 562, 189 *A.*2d 712 (1963). We address in this case only the first of those inquiries, whether the regulation violates the enabling act's express or implied legislative policy.

In *Williams* I, *supra*, we recognized "that government cannot achieve the impossible and that despite the best of efforts, some people will indeed slip through the net." 116 *N.J.* at 123, 561 *A.*2d 244. Thus, the State argues that to terminate these claimants' benefits is consistent with legislative policies. But Passaic County Legal Aid Society made the point at oral argument that these petitioners are not slipping through the net, they are being pushed through the net. That the time may come when people will have to be pushed through the net is altogether possible, but we have no indication that our Legislature has yet reached that point in its struggle to meet the needs of the homeless.

Before us, the Commissioner was candid to state that, if DHS has sufficient appropriations to continue TRA to meet the needs of these petitioners, the GA Law contemplates that such assistance should be extended. The problem with this case is that it was not tried on the basis that available appropriations had been exhausted but on the basis that the regulations required the termination of the benefits. DHS has made its position clear in the language it uses to deny further extensions of TRA:

> On occasion the Division has relaxed the strictures of regulation in the face of hard evidence establishing imminent gainful employment or affordable housing, and a showing that a brief extension was both necessary and sufficient to avert the loss of either. In this instance, that brief extension has been given and the present record has established no pattern of fact sufficiently compelling to allow a further extension.

That DHS would continue to provide benefits to those who have found work and would be able to find housing, but would not

provide continuing shelter for those who are unable to find either work or housing, is a paradox. Furthermore, that DHS would create standards for extensions of TRA such as the one quoted above, which is not found in the regulations and does not fulfill the requirements of the DHS safety net as established in *Williams,* undercuts the administrative process. Although in its brief before us DHS informally estimated that it would require an additional $1,421,000 were it to lift the twelve-month limit on TRA, the exhibit in support of that figure assumes a scenario in which the TRA recipients would continue to receive those benefits for the duration of their GA eligibility. We realize that DHS has not an open faucet from which it receives an unlimited supply of funds. However, as we have seen in Larry Tillman's case, pursuit of programs such as SSI can eliminate altogether the need for TRA. Hence, we do not find on this record that the Legislature has refused to appropriate sufficient funds to administer the TRA program. In terms of conservation of public funds, we note too that it may cost more to cure the illness and disease caused by homelessness than it would cost to provide shelter to those who need it. For example, Lee Wilkins had been in a drug-rehabilitation center for almost two months at the time of oral argument. We surmise that public funds were required for his care.

If an effective service plan is generated, public costs may be lessened. The Commissioner should give the agency's regulation a chance to work: before termination of benefits he should require that an effective individualized service plan be developed. By insisting on adherence to that element of the TRA program, the Commissioner would fulfill the promise of change outlined in his recent report to the Legislature, particularly fulfillment of the parallel goals of the Family Development Act of 1991, *L.* 1991, *c.* 523. That Act calls for a demonstration project that will provide occupational and educational programs for GA recipients. The cases before us may be atypical. They all come from one town, Paterson. As the Senior Deputy Attorney General arguing for DHS explained, the agency "does not chronicle its successes" in the more than 500 other municipalities of this State. The many

recent legislative changes in the field of public assistance hold the promise of ending "the bonds of welfare dependency." *L.* 1991, *c.* 523, § 2. These cases may have arisen in a period of transition from old ways to new. But in the words of the Commissioner, for many people "the GA program represents their last hope, the final shred of the safety net." *Report to the Legislature, supra,* at 7.

To sum up, the GA program is designed to provide shelter of last resort to a small class of needy New Jersey residents. TRA is one of the programs designed by the Commissioner to ensure that persons receiving GA are temporarily housed until they can find shelter elsewhere. To denote such a program as *temporary* rental assistance makes sense because the program contemplates an active effort by administrators of the program at the local level to put the claimants on their feet by finding employment for the employable and securing disability benefits for the unemployable. Wisdom counsels a twelve-month expiration period to check the natural tendency toward bureaucratic inefficiency. Bells and whistles should sound at the end of a year. However, we do not read the legislation as contemplating that at the end of the year, EA recipients shall be returned to the streets even though they have made every effort to turn their lives around. The Chief ALJ and the Commissioner agreed that that "nagging question" required resolution. If some other agency of government, other than the MWDs, is obliged to provide shelter of last resort for such claimants, that obligation should be clearly stated in the regulatory program. To be told by the agency chosen to provide shelter of last resort that your time is up and you must return to the streets is especially ironic.

The question before us is not whether the homeless have a constitutional right to shelter. *See* Connie M. Pascale, *Homeless People Have Rights Too,* 156 *N.J. Lawyer* 18, 22 (1993) (analyzing that question under New Jersey law). Rather, it is, for now, what the Legislature intends. In *Williams* I, *supra,* we concluded that then-Governor Kean, by his allusion to the poet Robert Frost's description of home, "surely intend[ed] that every citizen of New

Jersey has a place to go where they must take you in." 116 *N.J.* at 124, 561 *A.*2d 244. We believe that the executive and legislative branches of New Jersey's government still share that intention. The question still "need[s] to be answered in the plain language of the streets: who is in charge here and how is the problem to be solved?" *Id.* at 117, 561 *A.*2d 244.

We are aware of the great demands that are made on an agency of government like DHS. Undoubtedly, DHS wishes that it had more funds in order to supervise the far-flung operations of the MWDs that shelter the homeless, as well as more funds to feed the hungry, care for the children and elderly, and heal the sick, because all needy people are deserving of the agency's attention. However, although there are no rankings in the "catalog of human suffering," *Rodgers v. Gibson,* 218 *N.J.Super.* 452, 457, 528 *A.*2d 43 (App.Div.1987), surely homelessness represents something uniquely devastating to the human spirit. As a society, we may be offended by the presence of homeless people among us; they are a silent rebuke to our way of life. "Once pitied, [the homeless are] now censured." Jill Smolowe, *Giving the Cold Shoulder, Time,* Dec. 6, 1993, at 28, 30. But the consequences of their status cannot be denied. "Reports abound documenting the gradual but inexorable disintegration of body and mind wrought by homelessness." John C. Connell, *A Right to Emergency Shelter for the Homeless Under the New Jersey Constitution,* 18 *Rutgers L.J.* 765, 786 (1987) (footnotes omitted). The same commentator described the condition of homeless persons:

> The human costs of homeless living are unconscionable. Food is often acquired only from charity or from public trash. Public restrooms offer rare opportunities for practicing personal hygiene and cleanliness. Days are expended in aimless attempts to seek out minimal sustenance through jobs, welfare, and various means of self-help. Moments of rest are stolen in the most public places. Criminal and sexual victimization is common; companionship is rare. The indignities are insufferable, at least in the eyes of those not homeless.

[*Id.* at 785–86 (footnote omitted).]

We cannot help but believe that our lawmakers do not intend to bring about such results and do not intend that their general appropriations for human services not attend to such needs.

If the time comes when our society can no longer afford to shelter the homeless, the Legislature will undoubtedly make that clear. The Massachusetts Legislature, faced with economic reversals that required it to cut EA appropriations from $62 million to $39 million, although maintaining basic allowances for shelter, spelled out areas in which it would not permit appropriation expenditures to be made, specifically eliminating coverage for security deposit guarantees, moving expenses, furniture storage, cost of transportation, child care allowances, and an array of benefits. In *Berrios v. Department of Public Welfare,* 411 *Mass.* 587, 583 *N.E.*2d 856 (1992), the Massachusetts Supreme Judicial Court upheld the agency action implementing such a clear legislative mandate. In the absence of such a mandate, we believe that the Legislature intends that the GA program be administered in such a way as to provide temporary shelter for the most needy of our citizens. A regulation that terminates TRA without a fallback provision for shelter conflicts with that purpose.

■ The judgment of the Appellate Division is reversed. The matter is remanded to the DHS for reconsideration of the needs of the claimants and the prompt development of effective plans under *N.J.A.C.* 10:85–4.6(c)5. As noted, some of these claimants may have found shelter elsewhere. DHS should not deny future claimants reasonable extensions from available funds unless (1) such claimants have failed to cooperate in the pursuit of effective plans developed by the local MWDs to avert their homelessness or (2) DHS shall have designated some other agency of government to provide shelter of last resort.

*For reversal and remandment*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.