842 A.2d 207 (2004)
367 N.J. Super. 61
In the Matter of READOPTION WITH AMENDMENTS OF DEATH PENALTY REGULATIONS N.J.A.C. 10A:23, by the New Jersey Department of Corrections.
Superior Court of New Jersey, Appellate Division.
Argued February 3, 2004.
Decided February 20, 2004.
*209 Kevin D. Walsh, argued the cause for appellant/cross-respondent New Jerseyans for a Death Penalty Moratorium.
David M. Ragonese, Deputy Attorney General, argued the cause for respondent/cross-appellant Department of Corrections (Peter C. Harvey, Attorney General, attorney; Patrick DeAlmeida, Deputy Attorney General, of counsel; Mr. Ragonese, on the brief).
Before Judges PRESSLER, CIANCIA and ALLEY.
*208 The opinion of the court was delivered by PRESSLER, P.J.A.D.
N.J.S.A. 2C:49-1 to -12 prescribes the procedures for carrying out a sentence of death by lethal injection. N.J.S.A. 2C:49-11 authorizes the Department of Corrections (DOC) to adopt rules and regulations to implement the statute. The DOC did so, first by promulgating an administrative policy and thereafter by the adoption and readoptions[1] of regulations pursuant to the Administrative Procedure Act, N.J.S.A. 52:14B-1, et seq. The regulations, codified as Chapter 23 of Title 10A of the New Jersey Administrative Code, were adopted in 1986, readopted with some amendment in 1992, again readopted with some amendment in 1996, and most recently readopted with some amendment in 2001. Appellant New Jerseyans for a Death Penalty Moratorium challenges the current regulations contending that they violate the cruel and unusual punishment proscriptions as well as the free speech guarantees of both the Federal and State Constitutions. In bringing this challenge, appellant sought a number of documents from DOC which DOC claimed to be privileged. By limited-remand order of this court, the claims of privilege were adjudicated by the Law Division and upheld as to some documents and rejected as to others. Before us now are appellant's challenge to the regulations and the appeal and cross-appeal by appellant and DOC from privilege rulings adverse to each.

I
We address first the challenge to the regulations. Our consideration is guided by the general proposition that rules and regulations adopted by an administrative agency are presumed reasonable and are required to be sustained if neither arbitrary nor unreasonable to the end that the agency's statutory grant be liberally construed to effectuate the legislative purpose. See, e.g., In re N.J. American Water Co., 169 N.J. 181, 188, 777 A.2d 46, 50 (2001); Abbott by Abbott v. Burke, 149 N.J. 145, 174, 693 A.2d 417, 431-432 (1997); L.T. v. N.J. Dept. of Human Services, 134 N.J. 304, 320-321, 633 A.2d 964, 973-974 (1993); In re Commissioner's Failure, 358 N.J.Super. 135, 149, 817 A.2d 355, 363 (App.Div.2003). Accordingly, judicial *210 review is limited to these three inquiries: (1) whether the administrative action violates express or implied legislative policies, (2) whether there is substantial evidence in the record to support the agency's actions, and (3) whether the agency clearly erred in reaching a conclusion unsupported by relevant factors. Matter of Musick, 143 N.J. 206, 216, 670 A.2d 11, 16-17 (1996). See also In re Distribution of Liquid Assets, 168 N.J. 1, 10-11, 773 A.2d 6, 11-12 (2001); R & R Marketing L.L.C. v. Brown-Forman Corp., 158 N.J. 170, 175, 729 A.2d 1, 3 (1999); Public Serv. Elec., and Gas Co. v. State Dept. of Envtl. Protect. 101 N.J. 95, 103, 501 A.2d 125, 129 (1985).
As we review this record, we think it clear that the main thrust of appellant's cruel and unusual argument is addressed not to the regulations it challenges but to the statutory authorization of capital punishment. We do not regard ourselves as being at liberty to revisit that legislative decision in view of the Supreme Court's repeated reaffirmation that, conceptually at least, capital punishment, if attended by mandated and appropriate adjudicative safeguards, does not violate the constitutional proscription. See, e.g., State v. Koskovich, 168 N.J. 448, 541, 776 A.2d 144, 203-204 (2001); State v. Loftin, 146 N.J. 295, 333, 680 A.2d 677, 695 (1996); State v. Hightower, 146 N.J. 239, 252, 680 A.2d 649, 655 (1996); State v. Martini, 139 N.J. 3, 20-21, 651 A.2d 949, 957 (1994); State v. Ramseur, 106 N.J. 123, 168-175, 524 A.2d 188, 209-213 (1987), cert. denied, 508 U.S. 947, 113 S.Ct. 2433, 124 L.Ed.2d 653 (1993). Nevertheless, we are satisfied that the cruel and unusual ban does have significant relevance in evaluating the validity of the DOC's lethal-injection regulations. That is to say, as Chief Justice Wilentz made clear in Ramseur, supra, 106 N.J. at 171-172, 524 A.2d at 211-212 the Court's first consideration of the constitutionality of the death penalty since its reintroduction in 1983, the test of cruel and unusual punishment is, in the end, informed simply by evolving, contemporary, community standards of decency and morality.[2]See also generally the concurring and dissenting opinion of Justice Long in State v. Koskovich, supra, 168 N.J. at 575, 776 A.2d 144. We are, therefore, satisfied that in dealing with the issue of whether the regulations comport with and effectuate legislative policy in having reenacted the death penalty, we must consider their consistency not only with the statutory mandate but also with contemporary standards of decency and morality as well. It is in that context that we evaluate the adequacy of the administrative record to support DOC's decision-making.
So viewed, we have concluded that because they lack evidential and reasoned support in this record, several of the regulations challenged by appellant appear to be arbitrary and unreasonable. We cannot, however, determine from this record whether there is indeed available rational support for them that was considered but unexpressed by DOC. Because of the patent gravity of the life and death issues implicated by the regulations, we have concluded that rather than simply striking down those regulations, DOC should have the opportunity to give them further consideration, by additional hearings if necessary, *211 and to articulate, if it is able to do so, a supporting basis for those determinations. In the meantime, however, we are satisfied that the regulations as a whole, as they now stand, may not be implemented by the carrying out of a death sentence.
We address first the appellant's challenges in which we find merit. To begin with, appellant challenges the deletion from the 2001 regulations of the previous requirement that during the execution, there be available an emergency cart containing "such equipment, supplies and medications as may be needed to revive the inmate in the event a last minute Stay of Execution is imposed ...." N.J.A.C. 10A:23-2.12(b) (repealed by R. 2001, d. 315). A requirement that the inmate have a cardiac monitor was also then deleted. DOC explained the deletion of these requirements simply by noting that "an emergency cart located at the exterior wall of the execution chamber is neither mandated nor operationally appropriate." 33 N.J.R. 2991. It also noted that inmates who had been sedated but not yet lethally injected would be able to be revived without the need for the cart. It appears that in this regard DOC was relying on its assumption that once the lethal injection has been administered, its effects are irreversible. That, at least, is how we interpret its tautological explanation that "the execution substances, when injected into the person sentenced to death, are lethal...." 33 N.J.R. 2013. The irreversibility of the lethal injection may, indeed, be a fact that is medically sound, but without an expressed reasoned medical opinion, that cannot be assumed to be true, and medical opinion might, in fact, suggest the contrary. This is particularly so in view of information collected by DOC from other jurisdictions showing that death is not instantaneous but may take up to thirty minutes. Our concern is that DOC itself does not have medical expertise, and nothing in the record suggests medical consultation and opinion on the reversibility issue or, indeed, whether there are any appropriate lethal drugs whose effects might be reversible.
We think it plain that an inmate who is being executed in error because a stay of execution has been issued after the injection is administered is wrongfully deprived of due process and fundamental fairness, to say nothing of life itself, if the State does not take every feasible and possible step to correct that error. Simply assuming irreversibility without an articulated medical basis is not enough. We appreciate that the grant of a stay of execution communicated to prison authorities after the lethal injection has been administered is not a likely event. It can, however, happen. It is a foreseeable occurrence. And should it occur, there can be no justification for depriving that inmate a chance at life, if there indeed is chance, and we are confident that contemporary standards of decency and morality would dictate that that chance be accorded. Consequently, unless and until DOC comes forward with strong medical evidence that there is no possibility of reversibility and no other suitable drugs whose effect is reversible, we are persuaded that a death sentence cannot be carried out under these regulations.
Appellant's free speech-free press argument is based on several of the provisions of the regulations, namely, N.J.A.C. 10A:23-2.2(b)(3)(iv), forbidding "contact of any kind ... between the person sentenced to death and any member of the news media"; N.J.A.C. 10A:23-2.5, imposing a blanket prohibition on filming of the execution, irrespective of by whom filmed and whether or not the film is ever displayed; and the implementation, by DOC protocol, of the regulation dealing *212 with media witnesses to the execution, N.J.A.C. 10A:23-2.4(h) and (i), permitting media witnessing only after the inmate is strapped to the gurney and the intravenous lines connected to him. DOC asserts that these limitations are justified by considerations of the inmate's privacy, legitimate penological objectives, and the security and safety needs of the correctional institution. The inmate-privacy suggestion is easily dealt with. The inmate can be given the choice of whether he wishes to speak to the press or have the execution filmed or have it witnessed by the media at some point prior to being strapped to the gurney and the intravenous lines connected. The free-speech concern is not, of course, implicated unless the inmate wishes to speak with the media, and any conflict between the inmate's right of privacy and the right of the press to fully witness and document the execution process simply does not arise where the prohibition on the press is absolute irrespective of the consent or acquiescence of the inmate and his family.
With respect to institutional safety and security, we appreciate that these concerns, when legitimate and having a rational nexus to governmental interest, normally afford an adequate justification for infringement upon the right of both free speech and free press. See generally Turner v. Safley, 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64, 79 (1987); In re Rules Adoption Regarding Inmate Mail, 120 N.J. 137, 147-154, 576 A.2d 274, 279-282 (1990). Our difficulty is that we see nothing in this record supporting DOC's assertion that penological objectives and safety concerns are genuinely served by these restrictions. We do not foreclose DOC's opportunity to develop a record that will somehow point to a rational connection between these infringements and legitimate justification therefor, but we do not find them in the mere recital of the shibboleth that the safety, security and orderly operation of the Capital Sentencing Unit require these restrictions.
There is, on the other hand, a significant public interest to be served by inmate opportunity for self-expression and as full a media coverage as is consistent with legitimate institutional concerns for safety, security and penological objectives. It is one thing for proponents and opponents to talk about capital punishment as an abstract proposition. It is quite another to see it carried out. Contemporary and evolving community standards of decency and morality are not reliably developed in a vacuum and under sanitized conditions, but rather should be based on an appreciation by the community of just what is involved, in human terms and in terms of decency and morality, in the State's putting a person to death. We do not believe that this is a matter of voyeurism. We believe, to the contrary, that it is a matter of demonstrating to the public the reality of the choices it makes. We therefore conclude that before DOC can deprive the inmate of his right to be heard, and before it can deprive the press of the right to report in detail on the execution process, and before it can deprive the public of the right to know how the process is actually carried out and what its implications are, it must show with some degree of specificity how its legitimate concerns for institutional safety and security and penological objectives are advanced by the restrictions of the regulations.
We have considered appellant's remaining challenges to the regulations, and conclude that as long as capital punishment by lethal injection remains a constitutionally unobjectionable legislative choice, the regulations are reasonably based on adequate evidential support and are consistent with the legislative objectives. With respect to the type of drugs and their amount to be *213 used in the lethal injection, the DOC has continually expressed concern that the execution be carried out as painlessly and humanely as possible, and those concerns have dictated its choice of drugs within the parameters of N.J.S.A. 2C:49-2, a choice which is a matter of some discretion pursuant to N.J.S.A. 2C:49-3(a), which leaves to the DOC the determination of "the substances... to be used in an execution." Appellant's concern that the lethal injection technique might cause unnecessary pain and suffering not contemplated by the Legislature or the DOC because of an idiosyncratic response by the inmate or a so-called botched execution or because the injection is not administered by a physician are functions not of the regulations but of the capital punishment statute itself. Given the underlying adjudicated constitutionality thereof, we cannot say that the regulations fail reasonably to implement the statute.
Appellant also objects to the regulations based on its assertion that the procedures are derived from recommendations of Fred Leuchter, who, it claims, is unqualified by education for that task and who, if not himself a Neo-Nazi, has given support to the more outrageous claims of Neo-Nazis. Not only do we conclude that the personal beliefs of Leuchter are irrelevant, but beyond that, the record demonstrates that in the two decades during which DOC has worked on lethal-injection procedures, it has consulted with many other sources. These are not Neo-Nazi inspired regulations.
We also reject appellant's contention that DOC failed to do a federal standards analysis as required by the Administrative Procedure Act, N.J.S.A. 52:14B-22 to -24, and N.J.A.C. 1:30-5.1(c)(4). Our review of the record persuades us that DOC's federal-standard statements were adequate to comply with this obligation. See 33 N.J.R. 2013, 2992. Nor do we find the regulations invalid because of DOC's admitted failure to retain a copy of each and every document on which it ever relied in the drafting of the regulations. Its retention of records and documents was, in our view, adequate to satisfy the requirements of N.J.A.C. 1:30-5.6. Finally, we have carefully considered the balance of appellant's challenges, and we are satisfied that they too are really challenges to capital punishment by lethal injection and not to the procedural prescriptions of the regulations.

II
We now address the claim of privilege. As we pointed out, DOC resisted much of appellant's broad discovery demand on grounds of privilege or right to confidentiality, and on appellant's motion for relief, we remanded to the trial court for determination, document by document. The privilege was sustained as to some documents and not as to others. Appellant appeals from all the rulings adverse to it, and DOC cross-appeals from some but not all of the rulings rejecting the privilege claim. As to material disputed on appeal, the trial court ordered a stay pending appeal, and it has been filed with us as a sealed and confidential appendix in two volumes. The documents in Volume I had been generally withheld in their entirety by DOC and those in Volume II were produced by DOC in redacted form. We refer to DOC's numbering system in our conclusions.
In general terms, DOC asserts that the documents it has withheld or redacted and as to whose discovery it continues to object are entitled to the pre-decisional deliberative-process privilege or are protected from disclosure by both the Open Public Records Act (OPRA), N.J.S.A. 47:1A-1 to -13, or the common law or both.
*214 With respect to the deliberative-process privilege, we are guided by the Supreme Court's explication in In re Liq. of Integrity Ins. Co., 165 N.J. 75, 83-88, 754 A.2d 1177, 1181-1184 (2000). In sum, the governmental entity claiming the privilege bears the burden of establishing that the document in question was in fact pre-decisional and that it is "deliberative in nature, containing opinions, recommendations, or advice about agency policies." Id. at 84-5, 754 A.2d at 1182. Moreover, "[p]urely factual material that does not reflect deliberative processes is not protected." Id. at 85, 754 A.2d at 1182. If the government meets this burden, the party seeking discovery is able to overcome the resulting presumption against disclosure by demonstrating a need that overrides the government interest in non-disclosure. Ibid. at 85, 754 A.2d at 1182-1183. In applying the balancing test between a party's need and the strong public interest in non-disclosure, the court must consider the following factors: "1) the relevance of the evidence; 2) the availability of other evidence; 3) the government's role in the litigation; and 4) the extent to which disclosure would hinder frank and independent discussion regarding contemplated policies and decisions." Id. at 85-86, 754 A.2d at 1183.
As to OPRA, DOC relies on that provision of N.J.S.A. 47:1A-1.1, which excepts "inter-agency or intra-agency advisory, consultative, or deliberative material" from the definition of government records required to be disclosed, and on N.J.S.A. 47:1A-1, which requires government, the Act notwithstanding, to protect "the citizen's reasonable expectation of privacy." DOC also relies on regulations, N.J.A.C. 10A:22-2.3 protecting designated DOC records. See also N.J.A.C. 10A:22-2.3(a)(7). Finally, OPRA speaks to the common-law right of access to public documents, providing that "it shall [not] be construed as limiting the common law right of access to a government record...." N.J.S.A. 47:1A-8. It is, moreover, well established that the claims of common-law right of access require a balancing between the individuals right to access and the public's interest in confidentiality. See, e.g., Loigman v. Kimmelman, 102 N.J. 98, 104, 505 A.2d 958, 961-962 (1986); McClain v. College Hosp., 99 N.J. 346, 354-355, 492 A.2d 991, 995-996 (1985).
With respect to the relationship between OPRA and the common-law right of access, N.J.S.A. 47:1A-9(b) provides that nothing in the Act shall be deemed to "abrogate or erode any executive or legislative privilege or grant of confidentiality heretofore established or recognized by the Constitution of this State, statute, court rule or judicial case law, which privilege or grant of confidentiality may duly be claimed to restrict public access to a public record or government record." The plain import of this provision, in our view, is that OPRA notwithstanding, the government may seek to withhold any public record subject to the common-law balancing test by claiming that the public interest for confidentiality outweighs the private right to access just as the citizen is entitled, pursuant to N.J.S.A. 47:1A-8, to claim that its right is superior to the public interest in confidentiality.
We consider appellant's right of access to the documents in dispute, all of which we have reviewed under seal, according to the foregoing principles and statutory provisions.
[The following portion of the opinion in which the court reviewed the privilege rulings document by document has been omitted at the court's request.]
Finally, there were missing documents as to which the trial court directed that if they were found and released, DOC should so advise the court, and if found and withheld, *215 the court be provided with the reasons for non-disclosure. There is nothing in the record to suggest that there were any further advisories to the court or that either party took action. We remand to the trial court to make a final determination as to the existence of these documents and, if found, their discoverability by appellant.

III
To summarize, with respect to the challenge to the regulations themselves, we remand to the DOC for further consideration consistent with this opinion, and we stay the implementation of the regulations until that reconsideration has been completed. As to the privilege claims, we remand to the trial court for entry of an amended order consistent with this opinion and for a further hearing, as required by this opinion, respecting the missing documents. We further direct that the trial court complete its proceedings respecting the missing documents prior to further proceedings by the DOC. We do not retain jurisdiction.
NOTES
[1] Each set of regulations carried an expiration date. The current regulations are due to expire on August 9, 2006.
[2] The tripartite test of cruel and unusual has been expressed in terms of contemporary standards of decency, the proportionality between the punishment and the nature of the offense and whether the punishment exceeds what is necessary to achieve legitimate penological objectives. See, e.g., Gregg v. Georgia, 428 U.S. 153, 168-187, 96 S.Ct. 2909, 2922-2932, 49 L.Ed.2d 859, 871-883 (1976); Trop v. Dulles, 356 U.S. 86, 100, 78 S.Ct. 590, 597-598, 2 L.Ed.2d 630, 642 (1958).