929 A.2d 1091 (2007)
395 N.J. Super. 471
Dennis PRYOR, Appellant
v.
DEPARTMENT OF CORRECTIONS, Respondent.
Superior Court of New Jersey, Appellate Division.
Submitted November 2, 2005.
Decided April 27, 2006.
Resubmitted December 20, 2006.
Decided August 9, 2007.
*1093 Dennis Pryor, appellant pro se.
Stuart Rabner, Attorney General, attorney for respondent (Patrick DeAlmeida, Assistant Attorney General, of counsel; Thomas E. Kemble, Deputy Attorney General, on the brief).
*1094 Before Judges STERN, A.A. RODRÍGUEZ and SABATINO.
The opinion of the court was delivered by
STERN, P.J.A.D.
On this appeal, Dennis Pryor, an inmate at the Adult Diagnostic and Treatment Center (ADTC), challenges the constitutionality of three regulations promulgated by the Department of Corrections (DOC). First, he challenges N.J.A.C. 10A:18-9.6, which allows the ADTC administrator to prohibit ADTC inmates from "recei[pt], possess[ion], distribut[ion], or display" of "not sexually oriented material" that "will impede the rehabilitation of inmate[s]." He claims that the regulation is unconstitutional because it "restricts inmate[s'] rights under common law and the First Amendment and the Fourteenth Amendment" to the Federal Constitution. In filing the appeal, appellant relied upon the 1987 Supreme Court opinion in Turner v. Safley, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). Second, he challenges the constitutionality of N.J.A.C. 10A:16-4.4, regulating exceptions to statutorily privileged inmate-therapist communications. Appellant asserts that that regulation "voids inmate-therapist confidentiality in contravention of protections offered by the Eighth and Fourteenth Amendments." Finally, he challenges N.J.A.C. 10A:4-4.1 *.260, which subjects an inmate "to disciplinary action and a sanction" for "refusing to submit to mandatory medical or other testing[,]" as "interfer[ing] with inmate rights under the common law and the Fourteenth Amendment to give informed voluntary consent to medical procedures."
Appellant also attacks the three regulations under state law.
In essence, appellant seeks to strike N.J.A.C. 10A:18-9.6 and N.J.A.C. 10A:16-4.4(c) through (f) as unconstitutional under both the federal and state constitutions, to modify subsection (g) of N.J.A.C. 10A:16-4.4 to require notice to inmates that certain disclosures trigger the therapist's "duty to warn[,]" to modify subsection (h) of that regulation "to provide that inmates be noticed that anything they say in therapy may be used against them later in civil commitment" proceedings, and to strike a portion of N.J.A.C. 10A:4-4.1 *.260.
As to appellant's challenge to N.J.A.C. 10A:4-4.1 *.260, we denied a stay of DNA testing on August 8, 2006 (filed August 15, 2006). Subsequently, the Supreme Court upheld the constitutionality of DNA testing in A.A. v. Attorney General, 189 N.J. 128, 914 A.2d 260 (2007) and State v. O'Hagen, 189 N.J. 140, 914 A.2d 267 (2007). We therefore summarily reject the challenge to N.J.A.C. 10A:4-4.1 *.260.
As to the other points, on April 27, 2006, we adjourned this appeal and ordered supplementary briefs to be filed after the United States Supreme Court's decision in Beard v. Banks, 548 U.S. ___, 126 S.Ct. 2572, 165 L.Ed.2d 697 (2006). Under Beard, courts must give "`substantial deference to the professional judgment of prison administrators[,]'" id. at ___, 126 S.Ct. at 2578, 165 L.Ed. 2d at 705 (quoting Overton v. Bazzetta, 539 U.S. 126, 132, 123 S.Ct. 2162, 2167, 156 L.Ed.2d 162, 170 (2003)), and restrictive regulations are permitted in the prison setting "if they are `reasonably related' to legitimate `penological interests' and are not an `exaggerated response' to such objectives." Ibid. (quoting Turner, supra, 482 U.S. at 87, 107 S.Ct. at 2261, 96 L.Ed.2d at 77-78) (citations omitted). In demonstrating that connection, the inmate has "the burden of persuasion[.]" Ibid.
In light of Beard, we reject the facial challenge to N.J.A.C. 10A:18-9.6 and conclude that there is a legitimate basis for *1095 the regulation's limitations on access to the magazines and literature at issue. Since Pennsylvania's ban on access to all newspapers and magazines by inmates of its Long-Term Segregation Unit was upheld on summary judgment in Beard, the limited access to literature challenged here should also be upheld, because it is similarly related to the need for "specialized treatment." As in Beard, the record, based on certifications of ADTC officials, is "adequate" to support the DOC's position as the regulation only reaches a limited group of inmates who require specialized treatment.[1]See id. at ___, 126 S.Ct. at 2578-79, 165 L.Ed.2d at 706. Appellant's state constitutional assertions also fail, because the state constitution provides no more protection than the Federal Constitution on these issues. See In re Rules Adoption Regarding Inmate Mail to Attorneys, 120 N.J. 137, 576 A.2d 274 (1990).
We also uphold N.J.A.C. 10A:16-4.4 in light of the challenge concerning the provision of psychological services to ADTC inmates.

I.
Appellant is presently incarcerated at the ADTC[2] serving an aggregate sentence of life imprisonment with twenty-five years parole ineligibility for aggravated sexual assault and other crimes. Every defendant convicted of a sex offense must be given a psychological examination. N.J.S.A. 2C:47-1. If it is found that the defendant's
conduct was characterized by a pattern of repetitive, compulsive behavior and *1096 that the offender is amenable to sex offender treatment and is willing to participate in such treatment, the court shall, upon the recommendation of the [DOC], sentence the offender to a term of incarceration to be served in the custody of the commissioner [of the DOC] at the [ADTC] for sex offender treatment[.][3]
[N.J.S.A. 2C:47-3(b).]
Parole from the ADTC is different than parole from other institutions, as it must "be based on a determination by the special classification review board that the offender has achieved a satisfactory level of progress in sex offender treatment." N.J.S.A. 2C:47-5. A sentence to the ADTC as a sex offender usually results in the prisoner serving more "real time" than a similarly situated non-sexual offender sentenced to the same custodial term in the custody of the Commissioner of Corrections, because the inmate receives specialized treatment aimed at sexual offender rehabilitation. See State v. Howard, 110 N.J. 113, 124-25, 539 A.2d 1203 (1988); State v. Luckey, 366 N.J.Super. 79, 90-97, 840 A.2d 862 (App.Div.2004).

II.
Appellant's challenge to N.J.A.C. 10A:18-9.6 follows written notifications by Grace Rogers, Administrator of the ADTC, pursuant to N.J.S.A. 2C:47-10 and its implementing regulations, that inmates would be barred from possession of parts of or the entirety of certain magazines. The specific appeal initiated with the confiscation of portions of appellant's copy of Black Men magazine. Appellant has exhausted his administrative remedies.
N.J.S.A. 2C:47-10, adopted in 1998,[4] provides in relevant part:
b. An inmate sentenced to a period of confinement in the Adult Diagnostic Treatment Center shall not receive, possess, distribute or exhibit within the center sexually oriented material, as defined in subsection a. of this section. Upon the discovery of any such material within the center, the commissioner shall provide for its removal and destruction, subject to a departmental appeal procedure for the withholding or removal of such material from the inmate's possession.
c. The commissioner shall request an inmate sentenced to confinement in the center to acknowledge in writing the requirements of this act prior to the enforcement of its provisions. Any inmate who violates the provisions of subsection b. of this section shall be subject to on-the-spot sanctions pursuant to rules and regulations adopted by the commissioner.
N.J.A.C. 10A:18-9.1 to -9.6 were adopted to implement the statute and moot the then pending challenge to the prior practice "by clarifying the statute's scope" regarding the possession and receipt of sexually explicit and oriented literature. See Waterman v. Farmer (Waterman III), 183 F.3d 208, 209, 211 (3d Cir.1999).[5] These regulations "significantly narrow[ed]" *1097 the scope of N.J.S.A. 2C:47-10. Ibid. They provided definitions for statutory terms that were otherwise vague and ambiguous (N.J.A.C. 10A:18-9.1, -9.2), prescribed procedures for notifying inmates of prohibited material (N.J.A.C. 10A:18-9.3), imposed sanctions for statutory violations (N.J.A.C. 10A:18-9.5), and exempted "all materials deemed to serve a legitimate rehabilitative purpose" (N.J.A.C. 10A:18-9.4). Waterman III, supra, 183 F.3d at 211. Using the Turner analysis, both the statute and regulations were upheld as constitutional by the Third Circuit in an opinion by Judge (now Justice) Alito. Id. at 209.
However, N.J.A.C. 10A:18-9.6, the regulation challenged by appellant, was not specifically addressed in Waterman III. That regulation allows the ADTC to prohibit material that is not sexually oriented if it is deemed to "impede" the inmates' rehabilitation. The regulation provides:
The provisions of this subchapter shall not preclude the Administrator or designee from prohibiting an inmate(s) at the [ADTC] to receive, possess, distribute, or display any material which is not sexually oriented material if the Administrator or designee, in consultation with the treatment staff, determines that the receipt, possession, distribution, or display of that material will impede the rehabilitation of the inmate(s).
[N.J.A.C. 10A:18-9.6.]
Thereunder, according to the DOC, the ADTC mailroom has authority to screen publications and other materials sent to the inmates "to ensure they do not endanger prison order and security, are not sexually oriented, and will not impede the rehabilitation of the ADTC inmates." The State provides an undisputed explanation of how the ADTC staff screens inmate publications pursuant to N.J.A.C. 10A:18-9.6:
[W]hen a publication may be inappropriate for the inmate population, the publication is routed to the treatment staff and/or the Administrator's Office to determine whether receipt, possession, distribution or display of the material will impede rehabilitation. . . . When a particular publication is found to repeatedly contain material that will impede rehabilitation, it is placed on a prohibited publication list and the ADTC inmate population is notified.
The ADTC utilized confiscation forms when publications are taken and inmates may appeal the confiscation or prohibition of material by submitting Administrative Remedy Forms or by submitting a memorandum of appeal. . . . A due process procedure outlined in N.J.A.C. 10A:18-4.13, regarding appeal from decisions to withhold disapproved publications is available and was utilized by [appellant].
In his initial brief, appellant claims that "N.J.A.C. 10A:18-9.6 unconstitutionally restricts [ADTC] inmate[s'] rights under the common law and the First Amendment and Fourteenth Amendment." He argues that, because of the language of N.J.A.C. 10A:18-9.6, "all of the protections afforded by the constraining definitions of subchapters 18-9.1 through 9.3 are defeated as any material that falls outside the restrictive cloak of those subchapters may still be denied to an inmate if the Administrator deems that material likely to impede the rehabilitation of that inmate." He asserts that the effect of this regulation has been to deny ADTC inmates "magazines and periodicals not primarily sexually oriented," including King magazine, "several issues" of Black Men's magazine, Sports Illustrated's Swimsuit Edition, psychotherapy and medical books, classic literature, several mainstream movies, and CD players and CDs. The argument essentially *1098 attacks the regulation as unconstitutionally vague and overbroad, asserting that it has no reasonable relationship to a legitimate penological interest or the specialized treatment at the ADTC, principally because they are "non-pornographic, non-obscene and non-sexually oriented material" and some censorship is premised on religious beliefs.
The DOC argues that N.J.A.C. 10A:18-9.6 is "reasonably related to a legitimate penological interest[,]" namely, maintaining prison security and order and the rehabilitation of ADTC inmates. It also disputes several of appellant's factual allegations.
At the time the parties' initial briefs were filed, the controlling method for analyzing whether a prison regulation was constitutional was articulated by the United States Supreme Court in Turner v. Safley, supra, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64. However, as previously stated, a case addressing the core issues of Turner was decided by the Court last term after the parties filed their briefs. In Beard v. Banks, decided on June 28, 2006, the Court reaffirmed its prior decision in Turner, and further explained how to review constitutional challenges to prison regulations. Beard, supra, 548 U.S. ___, 126 S.Ct. 2572, 165 L.Ed.2d 697. We thereafter requested that the parties file supplemental briefs.
In his supplemental brief, appellant argues that the "defense of [N.J.A.C.] 10A:18-9.6 fails to save [the] regulation from constitutional infirmity." He contends that the regulation is "not reasonably related to valid penal interests," the "lack of alternative means of exercising First Amendment rights invalidates subchapter 18-9.6[,]" the "impact of accommodations of prisoner rights on staff/resources" of invalidating the regulation would be to allow for clearer guidelines and would have no affect on treatment, and "ready alternatives" to the regulation, such as rewriting it, are available "at de minimus cost[.]" The DOC reasserts its earlier position that appellant's "constitutional challenge to N.J.A.C. 10A:18-9.6 should be dismissed[,] because the regulation is reasonably related to a legitimate penological interest and it does not violate the First and Fourteenth Amendments to the United States Constitution."

A.
The Supreme Court's decision in Beard v. Banks reaffirmed that the cases of Turner v. Safley, supra, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64, and Overton v. Bazzetta, supra, 539 U.S. 126, 123 S.Ct. 2162, 156 L.Ed.2d 162, continue to provide "the basic substantive legal standards" for analyzing the constitutionality of prison regulations. Beard, supra, 548 U.S. at ___, 126 S.Ct. at 2577, 165 L.Ed.2d at 704. In Beard, the Court held that regulations denying prisoners in Pennsylvania's Long Term Segregation Unit, which is "reserved for the Commonwealth's `most incorrigible, recalcitrant inmates[,]'" all "access to newspapers, magazines, or personal photographs" did not violate the inmates' First Amendment rights, as "prison officials . . . set forth adequate legal support for the policy." Id. at ___, 126 S.Ct. at 2576, 165 L.Ed.2d at 702-03. As such, although prisoners have First Amendment protections, "restrictive prison regulations are permissible if they are `reasonably related' to legitimate penological interests' . . . and are not an `exaggerated response' to such objectives." Id. at ___, 126 S.Ct. at 2578, 165 L.Ed.2d at 705 (quoting and citing Turner, supra, 482 U.S. at 87, 107 S.Ct. at 2261, 96 L.Ed.2d at 78).
Furthermore, the Court reaffirmed the use of the four factors set out in *1099 Turner to "`determin[e] the reasonableness of the regulation at issue'":
[f]irst, is there a "`valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it"? Second, are there "alternative means of exercising the right that remain open to prison inmates"? Third, what "impact" will "accommodation of the asserted constitutional right . . . have on guards and other inmates, and on the allocation of prison resources generally"? And, fourth, are "ready alternatives" for furthering the governmental interest available?
[Ibid. (quoting Turner, supra, 482 U.S. at 89-91, 107 S.Ct. at 2262, 96 L.Ed.2d at 79-80) (internal citations omitted).]
See also In re Rules Adoption Regarding Inmate Mail, supra, 120 N.J. at 146-54, 576 A.2d 274 (New Jersey Supreme Court's utilization of the Turner analysis).
In reviewing regulations under Turner, "the real task . . . is not balancing these factors, but rather determining whether the [promulgator of the regulations] shows more than simply a logical relation, that is, whether [the promulgator] shows a reasonable relation." Beard, supra, 548 U.S. at ___, 126 S.Ct. at 2580, 165 L.Ed.2d at 707. Using this analysis, the Court in Beard determined that the sole purpose of "providing increased incentives for better prison behavior" is a reasonable justification for a regulation. Id. at ___, 126 S.Ct. at 2578-79, 165 L.Ed.2d at 706.
The Court also stated the limits of what it believes to be an unconstitutional restriction on prisoner's First Amendment rights. It wrote that the standard it articulated in Overton has not changed: "we agree that `the restriction here is severe' and `if faced with evidence that [it were] a de facto permanent ban . . . we might well reach a different conclusion in a challenge to a particular application of the regulation.'" Id. at ___, 126 S.Ct. at 2582, 165 L.Ed.2d at 709 (quoting Overton, supra, 539 U.S. at 134, 123 S.Ct. at 2169, 156 L.Ed.2d at 172).
In accordance with Beard, the constitutionality of N.J.A.C. 10A:18-9.6 must be analyzed under the four factors set out in Turner, supra, 482 U.S. at 89-91, 107 S.Ct. at 2262, 96 L.Ed.2d at 79-80.
In support of the regulation, respondent offered "affidavits by William Plantier, the Director of Operations for the DOC[][and] Grace Rogers, Administrator of the [ADTC.]" Respondent subsequently attempted to supplement the record with the affidavit of "Nancy W. Graffin, Ph.D., Program Director of Treatment Services at the ADTC[.]" As stated above, in light of Beard, we reconsider our earlier denial of the DOC's motion to supplement the record and allow supplementation by way of Dr. Graffin's affidavit.[6]
The first inquiry under Turner is if "there [is] a `valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it[.]" Beard, supra, 548 U.S. at ___, 126 S.Ct. at 2578, 165 L.Ed.2d at 705 (quoting Turner, supra, 482 U.S. at 89, 107 S.Ct. at 2262, 96 L.Ed.2d at 79).
Dr. Graffin's affidavit provides sufficient rationale for N.J.A.C. 10A:18-9.6 under the first prong of the standard of review from the Beard-Turner line of cases. She explains that the types of publications *1100 the Administrator has barred under her authority in N.J.A.C. 10A:18-9.6, and why they were barred. Specifically, Graffin certifies that
[v]arious publications available to and appropriate for the general public may not be appropriate for viewing by inmates incarcerated at the ADTC. Such publications would include those whose purposes, while not explicitly stated, is to objectify and exploit individuals depicted within them.
Further, Dr. Graffin explains that the publications are inappropriate, because "[e]very inmate at the ADTC has violated the rights of others by using their victims for sexual gratification. This behavior is rooted in a pervasive tendency to objectify other people." She then offers a rationale for the regulation by connecting therapy goals and methods and the need to bar inmate access to certain materials:
[i]n treating these sex offenders, one of the therapist's goals is to assist them in developing an understanding of the impact their offending behavior has had on others. This is facilitated when inmates acquire an appreciation of the humanity of all people, regardless of age or gender.
[] By disallowing the distribution of publications which, while not pornographic, are nonetheless focused on the depiction of individuals as objects for sexual interest or pleasure, the ADTC's Administration is supporting the work of the treatment program.
These explanations in the affidavits show why the prohibition of "sexually oriented materials" under N.J.A.C. 10A:18-9.1 to -9.3 is not alone sufficient.[7] It explains why certain publications are harmful to inmates' rehabilitation, in which the government has a legitimate interest. As such, the record demonstrates a "`valid, rational connection' between the prison regulation['s]" giving the Administrator authority to prohibit certain materials which do not fit squarely within the definition of "sexually oriented" and the government's interest in rehabilitation. See Beard, supra, 548 U.S. at ___, 126 S.Ct. at 2578, 165 L.Ed.2d at 705 (quoting Turner, supra, 482 U.S. at 89, 107 S.Ct. at 2262, 96 L.Ed.2d at 79). From this, the conclusion can be drawn "that the regulations do, in fact, serve the function identified[]" and are reasonable. Id. at ___, 126 S.Ct. at 2579, 165 L.Ed.2d at 706-07.
Further, the rationale given for the regulation is of similar specificity to that in Beard. See id. at ___, 126 S.Ct. at 2579, 165 L.Ed.2d at 706 (sufficient rationale for the regulation was that it was necessary "to `motivat[e]' better `behavior' on the part of these `particularly difficult prisoners,' by providing them with an incentive to move to level 1 [a less restrictive unit], or out of the LTSU altogether, and to `discourage backsliding' on the part of level 1 inmates"). The Graffin affidavit also provides approximately the same level of proof of the regulation's effectiveness as was accepted in Beard, where the Court emphasized that the Pennsylvania Deputy Prison Superintendent's statements were evidence "that the regulations do, in fact, serve the function identified." Beard, supra, 548 U.S. at ___, 126 S.Ct. at 2579, 165 L.Ed.2d at 706-07.
The second question in the Turner analysis relates to whether there are any "alternative means of exercising the rights that remain open to prison inmates[.]" Id. at ___, 126 S.Ct. at 2578, 165 L.Ed.2d at *1101 705 (quoting Turner, supra, 482 U.S. at 90, 107 S.Ct. at 2262, 96 L.Ed.2d at 79). Appellant argues that N.J.A.C. 10A:18-9.6 "would eliminate all alternative means to acquiring information about how to enhance intimate relationships with adult partners or spouses, a prohibition far a field (sic) of the [S]tate's valid interest in preventing criminal sexual behavior. . . ." However, N.J.A.C. 10A:18-9.6 does not ban all publications, it only applies to those which would "impede" rehabilitation. Further, the second Turner factor is intended to be applied with deference to the expertise of corrections officials. Turner, supra, 482 U.S. at 90, 107 S.Ct. at 2262, 96 L.Ed.2d at 79 (citing Pell v. Procunier, 417 U.S. 817, 827, 94 S.Ct. 2800, 2806, 41 L.Ed.2d 495, 504 (1974)). Here, inmates are not being barred from access to all publications and reasoning for the ban is given for the prohibited items in the form of memoranda from prison administration. Rogers' affidavit further explains that magazines including the 2004 Sports Illustrated Swimsuit Edition, "STUFF, Maxim, FHM, King, XXL, [and] Hot Male Couples: 2 and XY" were banned as they were "found to repeatedly contain material that will impede the rehabilitation of the ADTC inmate(s) [and were] placed on a prohibited publication list." Further, an alternate means exists for inmates to exercise their right to read. They have access to non-sexually explicit and otherwise non-detrimental publications and materials. See Beard, supra, 548 U.S. at ___, 126 S.Ct. at 2580, 165 L.Ed.2d at 707 (complete ban on newspapers and magazines is not per se unreasonable).[8]
The third factor that must be considered is "what `impact' will `accommodation' of the asserted constitutional right . . . have on guards and other inmates, and on the allocation of prison resources generally[.]" Id. at ___, 126 S.Ct. at 2578, 165 L.Ed.2d at 705 (quoting Turner, supra, 482 U.S. at 90, 107 S.Ct. at 2262, 96 L.Ed.2d at 79-80). In this case, according to the affidavit of Administrator Rogers, the only way to control material that adversely impacts rehabilitation efforts is to ban it outright, as "[o]nce publications or other materials are received by members of the ADTC inmate population, it is impossible for the prison administrators to control [their] circulation . . . among inmates." This assertion is sufficient to satisfy the third Turner prong, as respondent has presented evidence that any allowance of banned material within ADTC walls will have a "negative" impact. See Beard, supra, 548 U.S. at ___, 126 S.Ct. at 2580, 165 L.Ed.2d at 707.
The final Turner factor asks whether "`ready alternatives' for furthering the governmental interest [are] available[.]" Id. at ___, 126 S.Ct. at 2578, 165 L.Ed.2d at 705 (citing Turner, supra, 482 U.S. at 89-91, 107 S.Ct. at 2262, 96 L.Ed.2d at 79-80). Appellant contends that an alternative to the regulation as it now stands is redrafting it to contain "specific, scientifically grounded guidelines as to what type of material would [impede inmates' treatment]." On the other hand, the DOC contends that appellant's access to most publications is sufficient to provide an alternative means of exercising his First Amendment rights. Beard establishes that a "ready alternative" requires that "accommodat[ions to] the prisoner's rights [must be] at de minimis cost to valid penological interests[]" for the burden of accommodation to be placed on the prison. Beard, supra, 548 U.S. at ___, 126 S.Ct. *1102 at 2580, 165 L.Ed.2d at 707 (quoting Turner, supra, 482 U.S. at 90-91, 107 S.Ct. at 2262, 96 L.Ed.2d at 80). N.J.A.C. 10A:18-9.6 gives broad authority to the prison "Administrator or designee[,]" and Beard also gives great deference to prison administration's "professional judgment[.]" See Beard, supra, 548 U.S. at ___, 126 S.Ct. at 2578, 165 L.Ed.2d at 705; see also Thornburgh v. Abbott, 490 U.S. 401, 407-08, 109 S.Ct. 1874, 1878-79, 104 L.Ed.2d 459, 469 (1989). Based on Rogers' statement about the flow of material within the ADTC, we cannot say that meaningful or appropriate alternatives to the ban are readily available. As in Beard, we must defer to the "professional judgment" of prison administrators who are obligated to "further legitimate prison objectives[]" in dealing with the challenge posed by inmates and their need for rehabilitation. Beard, supra, 548 U.S. at ___, 126 S.Ct. at 2580, 165 L.Ed.2d at 708.
The regulation before us is considerably less restrictive than the regulation upheld by the Supreme Court in Beard, and as a "reasonable relation" between the need for and implementation of the regulation has been demonstrated, we uphold N.J.A.C. 10A:18-9.6 under Beard.

B.
The free speech clause of the New Jersey Constitution reads, "[e]very person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right. No law shall be passed to restrain or abridge the liberty of speech or of the press." N.J. Const. art. I, ¶ 6. Because New Jersey courts "ordinarily interpret our State Constitution's free speech clause to be no more restrictive than the federal free speech clause, . . . `[w]e rely on federal constitutional principles in interpreting the free speech clause of the New Jersey Constitution.'" Hamilton Amusement Ctr. v. Verniero, 156 N.J. 254, 264, 716 A.2d 1137 (quoting Karins v. City of Atlantic City, 152 N.J. 532, 547, 706 A.2d 706 (1998)). Two exceptions exist to this general rule: "political expressions at privately-owned-and-operated shopping malls, New Jersey Coalition v. J.M.B., 138 N.J. 326, 650 A.2d 757 (1994), and defamation, Sisler v. Gannett Co., 104 N.J. 256, 271, 516 A.2d 1083 (1986)." Id. at 265, 716 A.2d 1137. See also Comm. for a Better Twin Rivers v. Twin Rivers Homeowners' Ass'n, 192 N.J. 344, 929 A.2d 1060, 2007 WL 2127686 (2007) (noting that New Jersey's guarantee of free speech may be enforced "under limited circumstances . . . against private entities" even in the absence of state action, id. at 355, 929 A.2d 1066, 2007 WL 2127686 at *5); State v. Schmid, 84 N.J. 535, 423 A.2d 615 (1980).
Our Supreme Court has previously employed the Turner analysis in evaluating a similar issue under state law. In In re Rules Adoption Regarding Inmate Mail to Attorneys, supra, 120 N.J. at 144-54, 576 A.2d 274, the Court applied the Turner factors in its review of regulations regarding prisoners' mail, finding the regulations concerning incoming mail "reasonably related to legitimate penological interests[.]" Id. at 150, 576 A.2d 274 (quoting Thornburgh, supra, 490 U.S. at 413, 109 S.Ct. at 1881, 104 L.Ed.2d at 473 (quoting Turner, supra, 482 U.S. at 89, 107 S.Ct. at 2261, 96 L.Ed.2d at 79)). The Court concluded that the DOC regulation, which embodied guidelines for processing and examining incoming mail but excluding legal correspondence, was "constitutionally valid" under the Turner standard. Id. at 150, 153-54, 576 A.2d 274.[9] Accordingly, we find no *1103 basis in New Jersey law to depart from Beard v. Banks, which restates and applies the Turner analysis.

C.
To the extent appellant continues to assert any other constitutional claim not addressed herein, Waterman III makes clear that "[b]ecause vagueness and overbreadth challenges embody `constitutional claims,' they must be analyzed under the four-pronged test announced in [Turner v.] Safley." Waterman III, supra, 183 F.3d at 212-13 (citations omitted). As to those claims, Judge Alito expressly stated that "if the challenged statute withstands review under [Turner v.] Safley, it does not violate the Constitution." Id. at 213 (citing Turner, supra, 482 U.S. at 89, 107 S.Ct. at 2262, 96 L.Ed.2d at 79). The court further noted that
the substantial overlap between the [Turner] test and the doctrines of vagueness and overbreadth suggests that the Supreme Court did not intend for those doctrines to apply with independent force in the prison-litigation context. It would therefore be both redundant and inconsistent with [Turner v.] Safley to subject [an applicable regulation] to an independent challenge under the doctrines of vagueness and overbreadth.
[Waterman III, supra, 183 F.3d at 213.]
Pryor nevertheless argues that inmates whose materials are banned under N.J.A.C. 10A:18-9.6 lack "notice or meaningful appeal" in violation of procedural due process protections. He further argues that there are procedures when sexually oriented material is banned but no procedures when non-sexually oriented material is banned, granting greater due process protections under N.J.A.C. 10A:18-9.3 for review of decisions to withhold sexually oriented materials. See N.J.A.C. 10A:18-9.3 (providing "procedures for notifying inmates of the withholding and removal of sexually oriented materials"). The issue implicates standards of procedure and fairness beyond constitutional principles, and we therefore consider it.
The State argues that there is a due process procedure at the ADTC in which inmates can appeal the confiscation of materials:
Pursuant to N.J.A.C. 10A:18-9.6, when it appears a publication may be inappropriate for the inmate population, the publication is routed to the treatment staff and/or the Administrator's Office to determine whether receipt, possession, distribution or display of the material will impede rehabilitation. When a particular publication is found to repeatedly contain material that will impede rehabilitation, it is placed on a prohibited publication list and the ADTC inmate population is notified.
The ADTC utilizes confiscation forms when publications are taken and inmates may appeal the confiscation or prohibition of material by submitting Administrative Remedy Forms or by submitting a memorandum of appeal. A due process procedure outlined in N.J.A.C. 10A:18-4.13, regarding appeal from decisions to withhold disapproved publications is available and was utilized by [appellant].
[(Citations omitted.)]
N.J.A.C. 10A:18-4.13 applies to all "correctional facilities operated by the [DOC]," see N.J.A.C. 10A:18-1.2,[10] and provides:

*1104 (a) When a publication has been withheld in the mail room or when a publication has been removed from the inmate's possession, the sender or inmate may appeal the action of the shift supervisor to the Administrator within 10 calendar days of the date of the notice.
(b) The sender or inmate shall be permitted to submit arguments, in writing to the Administrator, that the challenged publication does not violate the category indicated in the report of the staff member.
(c) The Administrator or designee, whose title shall not be lower than Associate Administrator, Assistant Superintendent or Director of Custody Operations, shall consider the appeal.
(d) The Administrator or designee shall issue a written decision on the appeal and respond to the sender or inmate, as appropriate, within 72 hours of receipt of the written appeal. If the decision is to withhold the publication from the inmate, the decision shall contain a specific finding that the publication violates the category indicated in the report of the staff member and a notification that the publication is being returned to the sender.
(e) If a publication is found to be objectionable only in part and such part is easily separable from the rest of the publication (such as a magazine article, etc.) the inmate shall be given the choice of whether to allow the correctional facility to excise the offending portion(s) or to forfeit his or her right to the publication.
[N.J.A.C. 10A:18-4.13.]
See also N.J.A.C. 10A:18-4.1 to -4.17 (regarding "publications" and is also applicable to all DOC institutions); N.J.A.C. 10A:18-2.1 to -.26 ("correspondence"); N.J.A.C. 10A:18-4.11 ("[p]rocedure for handling withheld publications"); N.J.A.C. 10A:18-4.12 ("[p]rocedure for handling publications removed from an inmate's possession[.]") Therefore, despite Pryor's assertions, a procedure, detailed in N.J.A.C. 10A:18-4.13, is in place at the ADTC for an inmate to appeal the Administrator's decision to withhold a particular publication because it has been deemed inappropriate, and that procedure satisfies due process.

D.
Finally, we emphasize that we only uphold N.J.A.C. 10A:18-9.6 as it applies to sexually explicit and other material prohibited from receipt and possession by inmates at the ADTC. We do not pass upon whether any magazine or literature was properly banned or classified. We leave a review of the challenges to specific bans just described to the appellate process, subject to our subsequent review pursuant to R. 2:2-3(a)(2). We further expect that the ADTC administrator will give a full and detailed explanation, specifically related to the document in question and its relation to sex offender treatment, in order to sustain the administrative determination with respect to each magazine. As Pryor's appeal challenging the withholding of specific magazines, periodicals, and other material has not been tested against the Beard standard, we remand to permit him to seek review as to specific items within forty-five days of the filing of this opinion.

III.
Appellant also challenges N.J.A.C. 10A:16-4.4[11] as violative of the Eighth and Fourteenth Amendments to the Federal *1105 Constitution, arguing that the regulation runs afoul of confidentiality rules governing inmate-therapist communications and interferes with inmates' right to medical treatment. He also argues that the regulation's impingement on inmate-therapist privilege violates the right to privacy guaranteed by Article I, paragraph 1 of the New Jersey Constitution. Pryor further asserts that the notice given to inmates of confidentiality limitations is insufficient. We will address each contention separately.

A.
Appellant objects to the duty imposed on mental health practitioners to "confer with the correctional facility Director of Psychology who will also contact the Health Services Unit, Director of Psychological Services to determine whether disclosure is necessary" under subsection (c) of the regulation. He asserts that subsections (d)-(f), which lay out how those individuals must determine whether reporting is necessary and how reporting, if required, should take place, impermissibly shift the treating therapist's duty to warn to other professionals and, in certain situations, the ADTC Administrator. According to Pryor, "[s]ections (d)-(f) further delegate the ultimate responsibility for making a duty to warn decision to someone other than the primary therapist." Appellant, therefore, asks us to strike the language contained in "N.J.A.C. 10:16-4.4(c) through (f) and modif[y][] subsection (g) to provide that the action stipulated must follow the decision of the primary therapist that a duty to warn situation exists and provide appropriate notification to the Administrator."
"It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." Helling v. McKinney, 509 U.S. 25, 31, 113 S.Ct. 2475, 2480, 125 L.Ed.2d 22, 30 (1993). Thus, inmates are entitled to receive reasonable medical care while incarcerated. Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), reh'g denied, 429 U.S. 1066, 97 S.Ct. 798, 50 L.Ed.2d 785 (1977). This includes the right to psychiatric or psychological care in addition to physical care. See Clark-Murphy v. Foreback, 439 F.3d 280, 292 (6th Cir.2006); Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754, 763 (3rd Cir.1979). As such, the occurrence of "deliberate indifference to serious medical needs of prisoners constitutes the `unnecessary and wanton infliction of pain,' proscribed by the Eighth Amendment." Estelle, supra, 429 U.S. at 104, 97 S.Ct. at 291, 50 L.Ed.2d at 260 (citations omitted); see also Wilson v. Seiter, 501 U.S. 294, 302-05, 111 S.Ct. 2321, 2326-28, 115 L.Ed.2d 271, 281-82 (1991).
Under the standard of "deliberate indifference[,]" intentional interference with proscribed treatment violates the Eighth Amendment, Estelle, supra, 429 U.S. at 104-105, 97 S.Ct. at 291, 50 L.Ed.2d at 260, but "accidental or inadvertent failure to provide adequate medical care to a prisoner" does not, Helling, supra, 509 U.S. at 32, 113 S.Ct. at 2480, 125 L.Ed.2d at 31 (citing Estelle, supra, 429 U.S. at 104, 97 S.Ct. at 291, 50 L.Ed.2d at 260). A violation of the Eighth Amendment occurs in the prison setting "only when two requirements are met. First, the deprivation alleged must be, objectively, `sufficiently serious,' a prison official's act or omission must result in the denial of `the minimal civilized measure of life's necessities[.]'" Farmer v. Brennan, 511 U.S. 825, 834, 114 S.Ct. 1970, 1977, 128 L.Ed.2d 811, 823 (1994) (citations omitted). Secondly, "a prison official must have a *1106 `sufficiently culpable state of mind[,]'" which requires the official to have acted with "deliberate indifference to inmate health or safety." Ibid. Thus, the determination of whether "deliberate indifference" exists centers on the "state of mind" of the prison official, id. at 838, 114 S.Ct. at 1979, 128 L.Ed.2d at 826 (quoting Wilson, supra, 501 U.S. at 299, 111 S.Ct. at 2324, 115 L.Ed.2d at 279), requiring that the official act with "subjective recklessness." Id. at 839-40, 114 S.Ct. at 1980, 128 L.Ed.2d at 827. "Subjective recklessness" occurs when a prison official "`consciously disregard[s]' a substantial risk of serious harm." Id. at 839, 114 S.Ct. at 1980, 128 L.Ed.2d at 826. As such,
a prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it.
[Id. at 847, 114 S.Ct. at 1984, 128 L.Ed.2d at 832.]
In In re Rules Adoption Regarding Inmate-Therapist Confidentiality, we addressed a prior challenge to N.J.A.C. 10A:16-4.4, striking down parts of the regulation as inconsistent with therapist-patient confidentiality privilege while upholding other parts as constitutionally permissible limitations. In re Rules Adoption Regarding Inmate-Therapist Confidentiality (In re Inmate-Therapist Confidentiality), 224 N.J.Super. 252, 540 A.2d 212 (App.Div.1988). That case only discussed the provisions that are now contained in sections (a) and (b) of the present regulation along with sections that we struck down as unconstitutional.[12]Id. at 255-56, 540 A.2d 212. However, when In re Inmate-Therapist Confidentiality was decided, the regulation contained a close equivalent to the exact terms as are now codified in sections (c) through (g). See 19 N.J.R. 541-42 (April 6, 1987).
The portions of the regulation deemed constitutionally permissible in In re Inmate-Therapist Confidentiality articulated that an exception to therapist-patient privilege was permissible only where there was "a clear and imminent danger to the inmate or others[.]" Id. at 262, 540 A.2d 212. We reasoned that the necessity for limiting exceptions to the privilege existed, because "it is obvious" that "a sex offender committed to the [ADTC] . . . who is required to undergo a program of specialized treatment for his mental condition . . . would be fearful if information disclosed by him to his clinical practitioner will be revealed to prison authorities." Ibid. However, we recognized that this was not a principle without limits:
[a] patient is entitled to freely disclose his symptoms and condition to his physician in confidence except `where the public interest or the private interest of the patient so demands.' A patient, therefore possesses a `limited right' to confidentiality in extrajudicial disclosures, `subject to exceptions prompted by the supervening interest of society.' Hague v. Williams, 37 N.J. 328, 336, 181 A.2d 345 (1962), just as a lawyer has no privilege in the lawyer-client relationship to protect or conceal intent to commit a crime. *1107

[Id. at 258-59, 540 A.2d 212 (quoting McIntosh v. Milano, 168 N.J.Super. 466, 490, 403 A.2d 500 (Law Div.1979)).]
See Marshall v. Klebanov, 188 N.J. 23, 35-36, 902 A.2d 873 (2006) (noting that the principles in McIntosh were subsequently codified as N.J.S.A. 2A:62A-16); see also id. at 38-39, 902 A.2d 873 (discussing therapists' duty to warn). In recognition of those limitations, we determined "that psychologist-patient privilege yields to obligation of psychologists, under administrative code, ethical rules, and tort law, to disclose information in situations of `clear and imminent danger[.]'" Kinsella v. Kinsella, 150 N.J. 276, 302, 696 A.2d 556 (1997) (explaining In re Inmate-Therapist Confidentiality, supra, 224 N.J.Super. at 257-59, 540 A.2d 212).
Challenged sections (c) through (g) of the regulation set forth the procedure for implementing the section (b) exceptions to the confidentiality requirement. In construing the regulation using its plain meaning, as it is not ambiguous on its face, see State v. Hoffman, 149 N.J. 564, 578, 695 A.2d 236 (1997) (explaining principles of statutory interpretation), N.J.A.C. 10A:16-4.4 operates within the disclosure parameters deemed constitutionally permissible by us in In re Inmate-Therapist Confidentiality, supra, 224 N.J.Super. 252, 540 A.2d 212. Furthermore, although they were not discussed in In re Inmate-Therapist Confidentiality, after determining that then-section (b), which is not part of the present regulation, and portions of then-section (c) (now in section (b) as amended) were unconstitutional, we held that "the remainder of the regulation shall remain in full force and effect." In re Inmate-Therapist Confidentiality, supra, 224 N.J.Super. at 263, 540 A.2d 212; N.J.A.C. 10A:16-4.4.
As a result, we follow the Supreme Court's "deliberate indifference" standard and adhere to In re Inmate-Therapist Confidentiality, supra, 224 N.J.Super. 252, 540 A.2d 212, in rejecting appellant's claim that N.J.A.C. 10A:16-4.4 violates the Eighth Amendment.[13] The requirements of this regulation do not demonstrate "deliberate indifference to serious medical needs of prisoners," as required to find an Eighth Amendment violation, nor do they suggest that disclosure will be authorized absent a clear and imminent danger. See, e.g., Helling, supra, 509 U.S. at 32, 113 S.Ct. at 2480, 125 L.Ed.2d at 31.

B.
Appellant argues that the notice of exceptions to confidentiality given to inmates via "Form 520I Inmate Therapist Confidentiality[,]" as required by N.J.A.C. 10A:16-4.4(h), is insufficient. As a remedy, appellant seeks "modifications to section (h) to provide that inmates be noticed that anything they say in therapy may be used against them later in Civil Commitment[.]"
Appellant asserts that the form does not inform the inmate that confidentiality may be breached if unreported past crimes are reported or when exceptions to confidentiality under subsection (b) occur. The form expressly states "[t]here are some subjects however which are not confidential and which the therapist must reveal to appropriate authorities." It then lists the exceptions denoted in N.J.A.C. 10:16-4.4(b), including the possible reporting of certain prior crimes. The disclosure of a past crime, however, must be limited to *1108 the narrow circumstances authorized by section (b)(5).[14]
Appellant further argues that Form 520I is flawed in that it fails to notice inmates of the possibility of their disclosures in therapy being used in later civil commitment proceedings under the Sexual Violent Predator Act ("SVPA" or "Act"). The form makes no mention of the SVPA, which, in N.J.S.A. 30:4-27.27, provides that "when it appears that a person may meet the criteria as a sexually violent predator, . . . the agency with jurisdiction shall give written notice to the Attorney General [within] ninety days, or as soon as practicable" of a convicted inmate's "anticipated release[,]" or a "commitment status review hearing" that may result in the discharge of an inmate who was deemed incompetent to stand for trial or was acquitted due to insanity. N.J.S.A. 30:4-27.27(a). The SVPA also provides that this disclosure is to be made "without regard to classification as confidential" and may include "psychological and medical records[,]" N.J.S.A. 30:4-27.27(b), although the records are to be "deemed confidential" with restrictions on their disclosure beyond the use proscribed in the Act, N.J.S.A. 30:4-27.27(c).
As appellant has not undergone a civil commitment hearing, he lacks standing at this time to raise this issue. R. 4:26-1; In re N.J. Bd. of Pub. Utils., 200 N.J.Super. 544, 556, 491 A.2d 1295 (App. Div.1985) ("Standing requires that a litigant have a sufficient stake and real adverseness with respect to the subject matter of the litigation, and a substantial likelihood that some harm will fall upon it in the event of an unfavorable decision."); see also Pressler, Current N.J. Court Rules, comment 2.1 on R. 4:26-1 at 1416 (2007). As we have said:
"[o]rdinarily, a litigant may not claim standing to assert the rights of the third party[,]" especially where one attempts to seek standing "`to vindicate the constitutional rights of some third party.'" This is so, because courts are loath to resolve constitutional issues in advance of necessity.
[State v. Dopp, 268 N.J.Super. 165, 173-74, 632 A.2d 1270 (App.Div.1993) (citations omitted).][15]
*1109 We therefore do not address appellant's arguments that the notice provided by Form 520-I is constitutionally flawed due to its failure to mention the consequences of the SVPA.
We add, however, that it may be prudent for DOC to modify subsection (h) of N.J.A.C. 10A:16-4.4 to mandate that "Form 520-I Inmate Therapist Confidentiality" inform inmates that anything they say in therapy may be used in subsequent civil commitment proceedings. The evolving law under the SVPA permits use of the records of an inmate's therapy, but due process and fundamental fairness may require that the inmate be advised of the potential for such use; in the absence of such a warning, some limitation on that use may be implemented. See, e.g., In re Civil Commitment of J.M.B., 395 N.J.Super. 69, 928 A.2d 102 (App.Div.2007); In re Civil Commitment of T.J.N., 390 N.J.Super. 218, 915 A.2d 53 (App.Div.2007). See also Bellamy, supra, 178 N.J. at 140, 835 A.2d 1231 (defendant pleading guilty to a sex offense has the right to withdraw his or her guilty plea if that defendant was not advised of possible consequences of his or her plea under the SVPA).

IV.
In sum, we reject appellant's challenges to N.J.A.C. 10A:18-9.6, N.J.A.C. 10A:16-4.4, and N.J.A.C. 10A:4-4.1 *.260 and hold that all three regulations comply with the Federal and State Constitutions. However, we remand to permit challenges to the withholding of specific items from appellant of specific items under the standards developed herein.
Affirmed and remanded.

APPENDIX
The portions of N.J.A.C. 10A:16-4.4 relevant to this appeal are as follows:
(a) Confidential relations between and among mental health practitioners and individuals or groups in the course of practice are privileged communications and not to be disclosed to any person.
(b) The following exceptions to privileged communications are applicable only in situations which present a clear and imminent danger to the inmate or others:
1. Where the inmate discloses planned action which involves a clear and substantial risk of imminent serious injury, disease or death to the inmate or other identifiable persons;
2. Where an escape plan is disclosed to the mental health practitioner;
3. Where drug trafficking for profit or illicit influence on others, involving Controlled Dangerous Substances (C.D.S.) or drug paraphernalia, presents a clear and imminent danger to the inmate or other identifiable persons;
4. Where the inmate discloses suicide plans or other life threatening behavior; and/or
5. Where the inmate discloses a past, previously unreported murder, aggravated sexual assault (meaning those offenses set forth in N.J.S.A. 2C:14-2(a)) or arson which resulted in a death, under circumstances which present a clear and imminent danger to other identifiable persons.
(c) When a mental health practitioner receives information concerning the exception categories listed in (b) above, the mental health practitioner shall immediately *1110 confer with the correctional facility Director of Psychology who will also contact the Health Services Unit, Director of Psychological Services to determine whether disclosure is necessary. Relevant considerations, in addition to the information given to the mental health practitioner may include, but are not limited to, whether:
1. It is known that another individual is serving a sentence for the crime confessed by the inmate to the mental health practitioner;
2. It can be ascertained that the crime was in fact committed, but no one was prosecuted;
3. The inmate is under consideration for parole and the Administrator, Special Classification Review Board, or State Parole Board is unaware that the inmate has committed, or plans to commit, another serious crime;
4. The inmate has described the criminal event or plan in such intimate detail as to render the story credible; and/or
5. Consequences of the inmate's past or intended conduct are considered dangerous to the health or well-being of correctional facility residents or personnel.
(d) In any case in which the mental health practitioner, the correctional facility Director of Psychology, and the Health Services Unit, Director of Psychological Services agree and conclude that the information does not fall within the scope of the exception categories listed in (b) above, no disclosure need be made.
(e) If the mental health practitioner, the correctional facility Director of Psychology, and the Health Services Unit, Director of Psychological Services believe that the subject matter falls within the scope of an exception category(ies) listed in (b) above, the Director of Psychology shall immediately make this information known to the correctional facility Administrator providing the facts and background information that are necessary to give the Administrator a clear understanding of the case.
(f) In any case in which the mental health practitioner, the correctional facility Director of Psychology and the Health Services Unit, Director of Psychological Services disagree as to whether disclosure should be made, the person who believes that the matter should be disclosed shall notify the Administrator immediately providing the facts and background information that are necessary to give the Administrator a clear understanding of the case.
(g) The Administrator shall institute such action as is deemed appropriate considering the needs of the correctional facility and facts of the particular case. This action may include, but is not limited to:
1. Requesting the Special Investigations Division to investigate further or to administer a polygraph test;
2. Transmitting information to the Central Office Special Investigations Division to refer to the prosecutor;
3. Initiating disciplinary charges against the inmate;
4. Placing the inmate in close custody pending the result of the investigation; and/or
5. Increasing the inmate's custody status to maximum.
(h) Upon entry into therapy, the inmate shall be advised of the limitations on confidentiality. The therapist shall ensure the inmate is given and the inmate reads Form 520I Inmate Therapist Confidentiality. Verbal notice shall be provided to illiterate inmates, inmates *1111 not sufficiently conversant with the English language and inmates otherwise unable to read due to a physical/medical inability. Notification of verbal notice shall be recorded by the therapist on the Form. The inmate shall be required to sign the Form before beginning therapy and the Form shall be filed in the psychological/psychiatric section of the inmate's MRF.
[N.J.A.C. 10A:16-4.4(a)-(h).]
Effective June 6, 2005 the regulation was amended as follows:
Existing references to the Internal Affairs Unit in N.J.A.C. 10A:16-4.4(g) have been amended to Special Investigations Division in accordance with the definition for Special Investigations Division at N.J.A.C. 10A:1-2.2. The Special Classification Review Board (SCRB) is tasked with the responsibility of determining the eligibility for parole consideration of inmates sentenced as sex offenders and committed to the Adult Diagnostic and Treatment Center. In accordance with the provisions of N.J.A.C. 10A:9-8.4, mental health information shall be provided to the SCRB; accordingly, new subsection (i) has been added to provisions establishing inmate/therapist confidentiality.
[37 N.J.R. 188(a).]
NOTES
[1] In our analysis of this issue, we reconsider our previous denial of the DOC's motion to supplement the record and appellant's motion to respond thereto, and we allow the supplementation of the record with the affidavit of Nancy W. Graffin, Ph.D. On September 28, 2006, we denied the Department's motion "pending review of the appeal on the record made and the briefs premised thereon." We now grant both motions (M-6694 and 6969-05) and, by so doing, also permit the filing of appellant's "supplemental brief in further support of appeal challenging constitutionality of N.J.A.C. 10A:18-9.6" and reply brief filed on August 21, 2006. To the extent appellant seeks to include additional items not contained therein, we note that our affirmance on this appeal is to the facial challenge to the regulation, leaving for later reviewbased on the appeals process noted hereinchallenges to specific items.
[2] The United States District Court for the District of New Jersey gave the following description of the ADTC and the treatment it provides:

In 1976, the [DOC] opened the ADTC . . . for the sole purpose of housing and serving sex offenders, i.e., pedophiles, child molesters, incestuous men, or rapists. To be admitted to the ADTC, sex offenders must exhibit sex offending behavior that is "repetitive and compulsive." . . . The ADTC contains 750 inmates, and approximately 70% of the inmates are pedophiles and incestuous fathers.
The ADTC attempts to rehabilitate its sexual offenders differently than do the other prison facilities. The therapeutic staff, which includes psychologists, at the ADTC provides the inmates with intense sex offender treatment in the hope that it can reduce recidivism and contribute to public safety. Specifically, the ADTC employs a four-step program that "is designed to present information and therapeutic experiences in a progressive order to ameliorate the offender's proclivity towards criminal sexual behavior." . . . The different steps focus on the concepts of victim empathy and the offender's deviant sexual arousal. For example, the final step requires the offenders to demonstrate victim sensitivity and an ability to connect emotionally with others. [Waterman v. Verniero (Waterman I), 12 F.Supp.2d 364, 367 (D.N.J.1998), rev'd sub nom., Waterman v. Farmer, 183 F.3d 208 (3d Cir.1999).]
In 1979 and 1998, the law concerning sentencing and confinement of sex offenders was substantially amended although critical provisions concerning treatment and parole once incarcerated at ADTC remain the same. See N.J.S.A. 2C:47-1 to -10.
[3] There is an exception to placement at the ADTC: probation can be imposed in limited circumstances with required "outpatient psychological or psychiatric treatment." N.J.S.A. 2C:47-3(b); but see State v. Hamm, 207 N.J.Super. 40, 503 A.2d 900 (App.Div.1986).
[4] Judge Wolin details the legislative history in Waterman I, supra, 12 F.Supp.2d at 367-69.
[5] In Waterman v. Verniero (Waterman I), 12 F.Supp.2d 364, 378 (D.N.J.1998), rev'd & remanded, Waterman III, supra, 183 F.3d 208, the District Court enjoined defendants from enforcing N.J.S.A. 2C:47-10 because of its finding that the statute was unconstitutional.
[6] Dr. Graffin's testimony was significant in Waterman III, 183 F.3d at 215-17. Dr. Graffin is on the staff of the University Corrections Health Care of the University of Medicine and Dentistry of New Jersey. We also note that Beard upheld a summary judgment, 548 U.S. at ___, 126 S.Ct. at 2578, 165 L.Ed.2d at 705.
[7] Dr. Graffin's assertions are not disputed or contested by any professional, and appellant did not endeavor to present a professional to contest the factual content of her affidavit when it was submitted.
[8] Moreover, there is a right to challenge any decision barring access to specific articles, magazines, and periodicals, and the appeal process can include the failure to give reasons related to access restrictions on a particular publication.
[9] However, the Court found the regulation concerning "outgoing inmate mail" to be "constitutionally deficient." Id. at 154, 576 A.2d 274.
[10] The ADTC "is the correctional facility designated to house persons who have been sentenced pursuant to N.J.S.A. 2C:47-1 et seq. . . . ." N.J.A.C. 10A:1-2.2.
[11] The regulation is reproduced in the appendix.
[12] We struck section (b) and subsections 3 and 5 of section (c) of N.J.A.C. 10A:16-4.4 as they then stood, because they permitted disclosure that was not "reasonably related to a legitimate penological goal of the corrections system," id. at 260, 540 A.2d 212 (citing Turner, supra, 482 U.S. at 87, 107 S.Ct. at 2261, 96 L.Ed.2d at 79), specifically those which extended beyond communications revealing "a clear and imminent danger to the inmate or others." Id. at 260-63, 540 A.2d 212.
[13] We note that our holding is limited to the regulation as it stood at the time appellant filed his initial brief. As stated in the appendix, N.J.A.C. 10A:16-4.4 has since been amended to add a new section (i) that relates specifically to sex offenders. No argument was presented to us regarding the newly added section, and we do not address it.
[14] The form executed by appellant on December 14, 1999 was "revised 2/6/89" after the decision in In re Inmate-Therapist Confidentiality, supra, 224 N.J.Super. 252, 540 A.2d 212. It reads:

During your incarceration you will be evaluated, counselled and/or treated by a psychologist, psychiatrist or other therapist.
Any information you discuss during counselling or therapy is usually confidential and is not revealed to authorities.
There are some subjects however which are not confidential and which the therapist must reveal to appropriate authorities. These are:
1. Planned actions which involve a clear and substantial risk or imminent serious injury, disease or death to you or to another identifiable person. Such actions include:
a. Escape plans;
b. Suicide plans or other threatening behavior;
c. Situations in which drug trafficking for profit or illicit influence on others, involving Controlled Dangerous Substances (C.D.S.) or drug paraphernalia, present a clear and imminent danger to the inmate or other identifiable persons; and/or
d. Murder and aggravated assaults, including those of a sexual nature.
2. Disclosure of a past, previously unreported murder, aggravated sexual assault (as set forth in N.J.S.A. 2C:14-2(a)) or arson which resulted in a death, under circumstances which present a clear and imminent danger to other identifiable persons.
[15] In State v. Bellamy, 178 N.J. 127, 835 A.2d 1231 (2003), the Supreme Court held that a defendant had to be advised of possible commitment under the Act when pleading guilty to a crime which might give rise to such commitment. There, the defendant was committed under the Act, and the holding was made prospective.